**In re Wayne A. SEARE, a/k/a Wayne Andrew Seare; and Marinette Tedoco, a/k/a Marinette Morales Tedoco, Marinette Fitzpatrick, Debtors.**

**Dignity Health, f/k/a Catholic Healthcare West, d/b/a St. Rose Dominican Health Foundation, Plaintiff,**

v.

**Wayne A. Seare, Defendant.**

**Bankruptcy No. BK–S–12–12173–BAM. Adversary No. 12–01108–BAM.**

United States Bankruptcy Court, D. Nevada.

April 9, 2013.

As Corrected April 10, 2013.

Kurt R. Bonds, Alverson, Taylor, Mortensen, Las Vegas, NV, for Plaintiff.

Anthony Deluca, Las Vegas, NV, for Defendant.

## OPINION SANCTIONING ATTORNEY ANTHONY J. DELUCA FOR FAILING TO REPRESENT WAYNE A. SEARE IN THIS ADVERSARY PROCEEDING[1]

BRUCE A. MARKELL, Bankruptcy Judge.

I. INTRODUCTION ................................................... 170

II. DETAILED FACTS ................................................ 171
 A. The St. Rose Litigation .................................... 171
 B. The Garnishment .......................................... 171
 C. The Initial Consultation ................................... 171
 D. The Bankruptcy Case is Filed .............................. 173
 E. The Adversary Proceeding is Filed ......................... 173
 F. DeLuca's Refusal to Defend ................................ 173
 G. The Order to Show Cause .................................. 174
 H. The Evidentiary Hearing ................................... 175
 I. St. Rose and Seare Settle the Adversary Claim ............. 176

III. THE PARTIES AND THEIR POSITIONS ............................ 176
 A. DeLuca's Arguments ....................................... 176
 B. Seare's Contentions ....................................... 178
 C. Seare's Credibility ........................................ 180

IV. LEGAL ANALYSIS ............................................... 181
 A. The Nature of the Legal Profession ........................ 181

---

1. Unless specified otherwise, all "Chapter" and "Section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532; all "Rule" references are to the Federal Rules of Bankruptcy Procedure, FED. R. BANKR.P. 1001–9037; all "Civil Rule" references are to the Federal Rules of Civil Procedure, FED.R.CIV.P. 1–86; and all "Evidence Rule" references are to the Federal Rules of Evidence, FED.R.EVID. 101–1103.

B. The Applicable Law and its Application to the Facts ................... 182
 1. Interplay Between State and Federal Law ........................ 182
 2. Unbundling ................................................... 183
 3. NEV. RULE OF PROF'L CONDUCT 1.1—Duty of Competence ............. 188
 a. *Legal Standard* ............................................ 188
 b. *Application* .............................................. 190
 4. NEV. RULE OF PROF'L CONDUCT 1.2(c)—Scope of Services ............ 192
 a. *Reasonable Under the Circumstances* ........................ 192
 *(1) Legal Standard* ........................................ 192
 *(2) Application* .......................................... 194
 b. *Informed Consent* ......................................... 196
 *(1) Legal Standard* ........................................ 196
 *(2) Application* .......................................... 203
 5. NEV. RULE OF PROF'L CONDUCT 1.5—Attorneys' Fees ................ 206
 a. *Legal Standard* ............................................ 206
 b. *Application* .............................................. 206
 6. NEV. RULE OF PROF'L CONDUCT 1.4—Communication with Clients..... 207
 a. *Legal Standard* ............................................ 207
 b. *Application* .............................................. 208
 7. The Bankruptcy Code ........................................... 209
 a. *Section 707(b)(4)(C)* ...................................... 209
 *(1) Legal Standard* ........................................ 209
 *(2) Application* .......................................... 211
 b. *Sections 526–528* ......................................... 213
 *(1) Legal Standard* ........................................ 213
 *(2) Application* .......................................... 214

V. SANCTIONS ........................................................ 216
 A. The Purpose of Sanctions ....................................... 216
 B. The Range of Sanctions......................................... 217
 C. The ABA Standards ............................................. 219
 1. The Duties Violated ........................................ 220
 2. DeLuca's Mental State ...................................... 221
 3. Seriousness of the Injury .................................. 221
 4. Aggravating or Mitigating Factors .......................... 223
 D. The Sanctions Imposed ......................................... 224
 1. Disgorgement of Fees ....................................... 224
 2. Publication of this Decision ............................... 226
 3. Continuing Education ....................................... 226
 4. Provision of this Decision to Future Clients................ 226

VI. CONCLUSION ...................................................... 227

## I. INTRODUCTION

■ When a consumer consults a lawyer, there is a reasonable expectation that the lawyer's advice will address the consumer's concerns. Here, that didn't happen. Although the consumers here—debtors Wayne Seare and Marinette Tedoco—gave their attorney what any attorney would need to identify their problem, the attorney gave bad advice. When the bad advice was discovered, the attorney, Anthony J. DeLuca, doubled down. He refused to assist Seare and Tedoco further, whether or not they had the money to pay him for it, which, as Chapter 7 debtors, they did not. DeLuca justified his inaction by pointing to provisions in his standard form retainer agreement that Seare and Tedoco had signed. For the reasons given in this opinion, that conduct was wrong.[2]

**2.** The court has the duty to enforce the requirements of professional conduct for law-

## II. DETAILED FACTS

### A. The St. Rose Litigation

Seare's legal odyssey began in December 2010 when he filed a complaint in the United States District Court for the District of Nevada alleging employment discrimination against his former employer, St. Rose Dominican Health Foundation ("St. Rose"),[3] the plaintiff in this adversary proceeding. In the district court proceeding, Seare submitted evidence in the form of e-mails that he had "embellished" to boost his claims. (Evid. Hr'g Tr. 10:16–17.) Ultimately, the district court ordered sanctions against Seare, dismissed his lawsuit with prejudice, and ordered him to pay St. Rose's attorney's fees. (Dist.Dkt. No. 36.[4])

In awarding these attorney's fees, the district court found that Seare knowingly provided false information to the court, allowed his attorney to file an amended complaint based upon the false information, and instituted and conducted litigation in bad faith—amounting to "fraud upon the court." (*Id.* at 3.) The district court then entered judgment on October 25, 2011 in the amount of the attorney's

fees, or $67,430.58 (the "Judgment").[5] (Dist.Dkt. No. 37.)

### B. The Garnishment

By January 2012, St. Rose had obtained a writ of execution and served the related writ of garnishment on Seare's current employer. (Dist.Dkt. Nos. 41, 43.) Seare's desire to have the garnishment permanently stopped drove Marinette Tedoco (his wife) and him (collectively, the "Debtors") to DeLuca to seek legal counsel about whether to file for bankruptcy. (Evid. Hr'g Tr. 3–4.)

### C. The Initial Consultation

On February 13, 2012, Seare and Tedoco consulted with DeLuca at his law office. (*See* Bankr.Dkt. No. 27 ¶ 31; Ex. G (Retainer Agreement, executed on Feb. 13, 2012).) It was around 5:00 p.m., and the Debtors were there with their two young children, ages four and six. (Dkt. No. 47 at 4.) They met personally with DeLuca, which, as it turned out, was the only direct contact they had with him during the entire case. (*Id.* at 3–4.) Among other documents, they gave DeLuca copies of both the Order for Wage Garnishment and Wage Sanctions.[6] (*Id.* at 2.) According to

---

yers for Chapter 7 debtors that appear to be violated when a represented Chapter 7 debtor appears *pro se* in an adversary proceeding. *In re Egwim,* 291 B.R. 559, 563 (Bankr. N.D.Ga.2003). While the applicable law, DeLuca's conduct, and the sanctions imposed are detailed below, the court initially highlights that "[u]nder the provisions of 11 U.S.C. § 329 and Rules 2016 and 2017 ..., [it] has the power and obligation to determine the services that an attorney for a debtor must perform in order to be entitled to a reasonable fee ... [and] the inherent power to regulate the conduct of attorneys that practice before [it]." *Id.* at 563 n. 2.

3. *Seare v. St. Rose Dominican Health Foundation,* No. 2:10–cv–02190–KJD–GWF, 2011 WL 5101972 (D.Nev. Oct. 25, 2011).

4. "Dist. Dkt. No." refers to the docket entry for documents filed electronically through CM/ECF in the federal district court case. *See id.* Likewise, "Bankr.Dkt. No." refers to documents filed electronically in the main bankruptcy case, and "Dkt. No." refers to documents filed electronically in this adversary proceeding.

5. The Judgment amount is the debt that St. Rose claimed is nondischargeable in this adversary proceeding (the "St. Rose Debt"). Seare did not contest that the debt was incurred through fraud, (Evid. Hr'g Tr. 13:10–11, Oct. 23, 2012), although he did assert that he has a valid defense to St. Rose's claims. (*See* Dkt. No. 13.)

6. It is unclear whether the Debtors gave DeLuca a copy of the Judgment and/or copies of

the Debtors, DeLuca flipped through the court papers and stated that hospital bills are dischargeable. (*Id.*)

After the short meeting with DeLuca, the Debtors were placed in a small room to sign and initial the 19–page retainer agreement (the "Retainer Agreement") under which they hired DeLuca. (*Id.* at 5.) DeLuca's staff periodically checked to see if they had completed the forms, but no one sat with them to explain any part of the Retainer Agreement. (*Id.*)

The Debtors proceeded to execute the Retainer Agreement and retain DeLuca with a $200 down payment. In addition, DeLuca provided them with a 19–page "Frequently Asked Questions" document (the "FAQ"). (Ex. N.) The Debtors signed every relevant page and initialed every relevant paragraph of the Retainer Agreement. (Ex. G.) At the bottom of every page (right above the Debtors' signatures) is the statement: "I have read, understand, and agree to this page and its contents." (*Id.*) On the last page (right above the Debtors' signatures) is the statement: "I have read and received the foregoing NINETEEN (19) pages and I understand and agree to its terms and conditions." (*Id.* at 19.)

Notably, DeLuca did not sign or initial the Retainer Agreement. (*Id.*) The first page, a welcome page of sorts that thanks prospective clients for their business and instructs them to sign and initial the following pages, is a form letter with DeLuca's printed signature. (*Id.* at 1.) It states that the Retainer Agreement is only valid if the Debtors sign and initial at every location indicated. (*Id.* at 1, 19.) The Retainer Agreement is evidently the same for all clients, with only a few differences in fees depending on whether the case is filed under Chapter 7 or Chapter 13. For the Debtors' Chapter 7 case, DeLuca's flat fee was $1,999.99. (*Id.* at 3.)

The Retainer Agreement separates basic services from those services that require additional fees:

BASIC SERVICES: Services to be performed by DeLuca & Associates include:

a. Analysis of debtor's financial situation and assistance in determining whether to file a petition under the United States Bankruptcy code whether in Chapter 7 or chapter 13. . . .

b. Review, preparation and filing of the petition, schedules, statement of affairs, and other documents required by the bankruptcy court;

c. Representation at the meeting of creditors.

d. Reasonable in person and telephonic consultation with the client. . . .

ADDITIONAL FEES: There are circumstances which may require additional fees. Additional attorney fees will be charged for additional services including but not limited to: [1] Addressing allegations of fraud or nondischargeability; . . . [13] . . . Adversary Proceedings. . . .

(*Id.* at 5, 7.) The Retainer Agreement does not explain the relationship between items [1] and [13].

The Retainer Agreement includes a fraud disclaimer: "DEBTS THAT DO NOT GO AWAY: Non-dischargeable

---

the Order for Wage Garnishment and Order for Sanctions. (*See* Evid. Hr'g Tr. 10:8–15; Dkt. No. 29 at 2; Dkt. No. 47 at 2.) Seare stated that he gave a copy of the Judgment and Writ of Garnishment to DeLuca and that DeLuca "thumbed through both of them." (Evid. Hr'g Tr. 10:8–15.) Tedoco later

claimed that they gave DeLuca a copy of the Order for Wage Garnishment and Wage Sanctions. (Dkt. No. 47 at 2.) DeLuca has no independent recollection of meeting the Debtors or of reviewing the Judgment. (Evid. Hr'g Tr. 40:8–16; Bankr.Dkt. No. 27 ¶ 34.)

debts (debts you must re-pay), or debts not affected by client's bankruptcy, include but are not limited to the following: ... debts incurred through fraud...." (*Id.* at 11.) It also includes a request for copies of "ALL LAWSUITS you have been involved in within the last (2) years...." (*Id.* at 12.) The FAQ also explains that debts incurred through fraud are nondischargeable. (Ex. N at 18.)

### D. The Bankruptcy Case is Filed

On February 29, 2012, DeLuca filed the Debtors' Chapter 7 bankruptcy petition. (Bankr.Dkt. No. 1.) The St. Rose Debt is listed as a garnishment on Schedule F in the amount of $67,431.00. (*Id.* at 36.) The district court lawsuit underlying the St. Rose Debt is listed on the Debtors' Statement of Financial Affairs as "St. Rose Dominican Hospital vs. Wayne Seare, Case No. 10CV–02190." (*Id.* at 45.) The Debtors' Schedule I indicates that Seare's net monthly take home pay was $2,808 (without deducting the garnishment) and that the monthly garnishment was $329.[7] (Bankr.Dkt. No. 1 at 40.) The Disclosure of Compensation of Attorney for Debtors (the "Rule 2016(b) Statement") states that the Debtors had agreed to exclude adversary proceedings from the flat fee. (*Id.* at 53.) The Section 341 meeting of creditors occurred in March 2012; St. Rose appeared through counsel and stated its intention to enforce its rights under the Judgment through nondischargeability proceedings. (*See* Ex. H.)

### E. The Adversary Proceeding is Filed

On May 24, 2012, St. Rose filed its adversary complaint against Seare (the "Complaint"), claiming nondischargeability under Section 523(a)(4) and (a)(6). (Dkt. No. 1.) On May 30, the court granted the Debtors' discharge with respect to all other debts. (Bankr.Dkt. No. 20.) Approximately $137,430 in unsecured debt was thus discharged, or 62% of the Debtors' unsecured, non-priority claims.[8] (Bankr. Dkt. No. 1.)

### F. DeLuca's Refusal to Defend

Within several days, on June 4, 2012, DeLuca sent the Debtors an e-mail informing them of their discharge and that, as of the discharge date, their case was completed. (Ex. H at 2–3.) The e-mail appears to be a form message. It does not mention the particulars of the Debtors' bankruptcy or the then-recently filed adversary proceeding. (*See id.*) It states, "we are very happy to inform you that you can now move forward with a fresh start on life, free from the stress of excessive debt. Now you can place your financial situation back on the right track." (*Id.* at 3.)

Also on June 4, the Debtors responded via e-mail to DeLuca's communication. (Ex. H at 2.) They thanked DeLuca for his e-mail and for "all the help in completing our [b]ankruptcy." (*Id.*)

They asked whether the St. Rose Debt was discharged, since they understood that St. Rose was going to pursue the adversary proceeding against them. (*Id.*) They closed the e-mail by asking DeLuca to "[p]lease let us know what we need to do." (*Id.*)

On June 5, 2012, DeLuca's office responded. (*Id.* at 1–2.) They reminded the

---

7. This is less than half of the maximum allowable garnishment, which at Seare's pay rate is 25% of his disposable earnings—$702 per month. Nev.Rev.Stat. § 31.295 (2011).

8. The approximately $137,430 derives from $219,943 in unsecured, non-priority claims less the St. Rose Debt ($67,431) and less several student loans (approximately $15,083). (Bankr.Dkt. No. 1.) The Debtors did not have any priority claims. (*See id.*)

Debtors that St. Rose had expressed its intention to pursue the Judgment against the Debtors at the Section 341 meeting of creditors. (*Id.* at 1.) The e-mail also stated that on April 16, 2012 DeLuca[9] had received a "fax cover letter ... with an attached Stipulation and Order regarding the discharge-ability [*sic*] of subject debt in question as to Mr. Sear [*sic*] only." (*Id.*) It then informed the debtors that DeLuca had responded to the fax by advising St. Rose's counsel that he "would not sign off on any [s]tipulation regarding the discharge-ability [*sic*] of any debt listed in the schedules." (*Id.*) Put more bluntly, DeLuca rejected the proposed stipulation and order without consulting with Seare. It is unclear whether DeLuca informed St. Rose that he was not representing Seare in the adversary proceeding. The e-mail then explained that DeLuca had performed all the duties for which he was contracted and that DeLuca would not represent Seare in the adversary proceeding. (*Id.* at 1–2.) It recommended that Seare retain another attorney, Mr. Terry Leavitt, to handle the adversary proceeding. (*Id.* at 2.)

On June 6, 2012, the Debtors replied to the e-mail. (*Id.* at 1.) They admitted to understanding that DeLuca was hired only to "do our bankruptcy," but were very upset and frustrated that the fax containing the proposed stipulation and order was never sent to them. (*Id.*) They asserted that they were never even aware that DeLuca had received those documents from St. Rose; "[n]ot informing your clients of very important documents and failing to return phone calls are unacceptable and unprofessional customer service." (*Id.*) They requested copies of the proposed stipulation and order and the adversary complaint. (*Id.*)

Also on June 6, DeLuca sent a letter to the Debtors informing them that he would not represent Seare in the adversary proceeding. (Ex. I.) The substance of the letter is essentially the same as the earlier e-mail. (*See* Exs. H, I.)

On June 27, 2012, Seare filed his answer pro se in the adversary proceeding. (Dkt. No. 13.) He argued that the debt was dischargeable "due to the hardship on the dependents of debtor." (*Id.* ¶¶ 11, 14.) He admitted to having "embellished" an e-mail in the district court proceeding, but stated that there is other evidence to support his position. (*Id.* ¶ 12.) Seare requested that the court modify the debt for "feasible payments," if it were found non-dischargeable, given that he has five dependents and lives paycheck-to-paycheck. (*Id.* ¶ 15.)

On August 2, 2012, the court held a scheduling conference for the adversary proceeding. DeLuca did not appear on behalf of Seare, who explained that DeLuca told him that DeLuca does not represent clients in adversary proceedings. (Dkt. No. 14 at 2.) St. Rose's counsel stated that she had informed DeLuca shortly after the Debtors filed their petition of St. Rose's intent to file a nondischargeability action. (*Id.*)

### G. The Order to Show Cause

On August 3, 2012, the court issued its "Order to Show Cause Why This Court Should Not Sanction Anthony J. DeLuca for Failing to Represent Debtor in the ... Adversary Proceeding" (Dkt. No. 14.) The court was concerned that DeLuca had not complied with specific provisions of Nevada's Rules of Professional Conduct,[10]

---

9. All references to "DeLuca" are inclusive of DeLuca's employees and office staff.

10. "Nevada Rule" refers to the Nevada Rules of Professional Conduct. NEV. RULES OF PROF'L CONDUCT 1.0–8.5 (2011).

made applicable to this proceeding by Local Rule IA 10–7(a). The court ordered DeLuca to explain why nonrepresentation in the adversary proceeding was reasonable and to establish the Debtors' informed consent for the limitation. It set a hearing on the Order to Show Cause ("OSC") for September 13, 2012.

Meanwhile, the adversary proceeding continued. On August 10, 2012, the court ordered a scheduling conference for September 13, which was later continued to October 19. On August 17, St. Rose filed its discovery plan. (Dkt. Nos. 17, 18, 21, 24.)

On August 22, 2012, DeLuca filed his brief in response to the Order to Show Cause (the "Reply Brief"). (Bankr.Dkt. No. 24.) The Reply Brief suffered from several procedural and substantive defects. DeLuca incorrectly filed the brief on the docket in the main bankruptcy case rather than the adversary proceeding. In addition, he did not file a certificate of service until October 24, 2012, one day after the evidentiary hearing at which the court ordered him to provide copies of his filings to Seare. (Dkt. No. 30.) DeLuca also failed to submit the retainer agreement that the Debtors had signed; instead, he submitted a blank, boilerplate document. (Bankr. Dkt. No. 24, Ex. B.) Substantively, DeLuca did not address the specific provisions of the Nevada Rules of Professional Conduct that the court had raised in the Order to Show Cause. (*See* Bankr.Dkt. No. 24.)

Back in the adversary proceeding proper, Seare, representing himself pro se, filed a witness list and initial disclosure statement on August 31, 2012. (Dkt. No. 19.)

On September 13, 2012, the court held the Order to Show Cause hearing ("OSC Hearing"). (OSC Hr'g Tr., Dkt. No. 34.) DeLuca, Seare, and Tedoco appeared. In addition to the previously-raised Nevada Rules of Professional Conduct, the court expressed concern that DeLuca had not complied with two sections of the Bankruptcy Code: 707(b)(4)(C), which mandates a "reasonable investigation into the circumstances that gave rise to the bankruptcy petition," and 526(a), which regulates debt relief agencies. (OSC Hr'g Tr. 13–14.) The court ordered additional briefing and set an evidentiary hearing (the "Evidentiary Hearing"), where either party could call witnesses. On September 20, 2012, the court issued the "Order Setting Evidentiary Hearing." (Dkt. No. 22.) The order confirmed the court's instructions at the OSC Hearing and set the Evidentiary Hearing for October 23, 2012.

The adversary proceeding moved forward. On September 28, 2012, the court issued an order setting a settlement conference on October 19, which was later continued to December 13. (Dkt. Nos. 24, 27.)

On October 19, 2012, Seare filed his "Hearing Brief" regarding the Evidentiary Hearing. (Dkt. No. 29.) The same day, DeLuca filed his supplemental brief in anticipation of the Evidentiary Hearing (the "Supplemental Brief"). (Bankr.Dkt. No. 27.) Again, he incorrectly filed it on the docket for the main bankruptcy case rather than the adversary proceeding. He also failed to file a certificate of service until one day after the Evidentiary Hearing. (Dkt. No. 31.) In addition to the brief, he filed a witness list, exhibit list, and various exhibits. (Bankr.Dkt. Nos. 28, 29.)

## H. The Evidentiary Hearing

On October 23, 2012, the court held the Evidentiary Hearing. (Evid. Hr'g Tr., Dkt. No. 35.) Only Seare and DeLuca testified. At the hearing's close, the court admitted all of DeLuca's proposed exhibits

and took the matter under submission. (*Id.* at 47:12–13.)

Back in the adversary proceeding, the court issued an order regarding trial and pretrial matters on October 29, 2012, setting trial for March 6–7, 2013. (Dkt. Nos. 32, 33.)

### I. St. Rose and Seare Settle the Adversary Claim

On December 5, 2012, St. Rose filed a stipulation and proposed order vacating the then-upcoming settlement conference. (Dkt. No. 48.) The filing indicates that Seare and St. Rose reached a tentative, confidential settlement for all claims in the adversary proceeding. (*Id.*) On December 6, the court approved the order and vacated the settlement conference. (Dkt. No. 49.) On January 2, 2013, St. Rose filed the "Confession of Judgment," in which Seare authorizes judgment against him in the amount of $67,430.58. (Dkt. No. 51.) Because the issue of nondischargeability is not relevant to the sanctions matter, the settlement does not render this analysis moot.

### III. THE PARTIES AND THEIR POSITIONS

■ These facts present the legal issue of when consumer bankruptcy attorneys such as DeLuca may limit the scope of their representation, a practice colloquially referred to as "unbundling." While unbundling is permissible, it must be done consistent with the rules of ethics and professional responsibility binding on all attorneys. Those rules allow a lawyer to limit his or her representation only when it is reasonable under the circumstances to do so, and only when the client gives informed consent to the limitation. In this case, DeLuca met neither of these requirements. As a defense, DeLuca asserts that his retainer overrides such mandatory

rules. As will be seen, his position is incorrect; to the extent his retainer is inconsistent with the applicable rules of professional responsibility, his retainer is unenforceable, and his abandonment of his clients violated norms applicable to lawyers generally.

### A. DeLuca's Arguments

DeLuca's primary argument is that the Debtors had the burden to inform him that the Judgment was based on Seare's fraud, and that they failed to meet this burden. In other words, he contends that he did not have an independent duty to investigate the nature of the Judgment. For this proposition, DeLuca cites the Retainer Agreement's request for copies of all lawsuits within the last two years that involved the Debtors. (Bankr.Dkt. No. 27 at 5–6.) He also stated that his office procedure is to request copies of all lawsuits from debtors for review by himself and/or his staff. (Evid. Hr'g Tr. 39:24–40:7.)

From this dubious premise regarding the Debtors' duties, he argues that the decision to unbundle all adversary proceedings, regardless of their relation to the relief requested or needed by a debtor was reasonable, and that the reasonable assumption of any attorney would be that a debt owed to a hospital is for medical care rather than a fraud judgment. (OSC Hr'g Tr. 4:8–18.) Had he known of the nature of the Judgment, so he argues, he would have declined to represent the Debtors in the first place. (Bankr.Dkt. No. 24 at 2.) He claims that he undertook representation based on "incomplete, inaccurate, or intentionally omitted information regarding the fraudulent nature of a significant portion of the Debtors' debt." (*Id.* at 3.) He further argues, using the benefit of hindsight, that it is reasonable to limit services when the client is a known liar. (Bankr.Dkt. No. 27 at 14.)

Also in the vein of reasonability, DeLuca asserts that, since the adversary proceeding was legally indefensible because Seare committed fraud, he pursued the only reasonable course of action—settling with St. Rose, which he attempted to do after the OSC Hearing.[11] (*Id.* at 9.)

DeLuca's next argument is that the Debtors gave informed consent to the exclusion of adversary proceedings. He asserts that the Retainer Agreement "specifically excludes adversary proceedings as part of the services provided ... for the basic fee." (Bankr.Dkt. No. 24 at 2.) He argues that the Debtors had ample warning of the likelihood of an adversary proceeding because St. Rose communicated its intent to enforce its rights under the Judgment at the Section 341 meeting. (*Id.*) He further argues that the Debtors were "clearly advised of what services were to be covered under the agreement," and testified that a staff member "go[es] through" the Retainer Agreement, paragraph-by-paragraph, with clients. (Bankr.Dkt. No. 27 at 14; Evid. Hr'g Tr. 41:20–42:2.) He points out that the Debtors signed the page that contains the "DEBTS THAT DO NOT GO AWAY" paragraph, which includes "[d]ebts incurred through fraud." (Bankr.Dkt. No. 27 at 4.) Moreover, he argues, the FAQ also explains that debts incurred through fraud are nondischargeable. (*Id.* at 12–13.) Lastly, he claims that the Retainer Agreement made clear that the representation ended "by operation of law" when the clients obtained their discharge. (*Id.* at 8.) In short, his argument is that the Debtors executed the Retainer Agreement with the knowledge

that (1) such debts are nondischargeable; (2) St. Rose would likely bring an adversary proceeding; (3) adversary proceedings were excluded from the flat fee; and (4) his representation ended when the clients obtained their discharge.

DeLuca seems to respond to the court's concern that he did not comply with Section 707(b)(4)(C) by claiming that he performed due diligence in light of the limited information that the Debtors provided and their urgency to file for bankruptcy. (*Id.* at 11–14.) He asserts that Seare understood the Retainer Agreement and was given a copy of the FAQ, and that Seare thus had the burden to inform DeLuca of any fraudulently incurred debts. (*Id.* at 12.) According to DeLuca, because this is merely an issue of credibility that turns on whether he actually reviewed the Judgment during the initial consultation, the court should side with him because Seare is a known liar. (*Id.* at 13.) DeLuca did not address the court's concerns about his compliance with Section 526(a).

DeLuca next claims that Seare suffered no prejudice from the nonrepresentation and that, in any event, Seare benefitted from the discharge. Seare suffered no prejudice, according to DeLuca, because he was "advised immediately after the filing of the adversary proceeding" that DeLuca would not represent him. (*Id.* at 10.) Seare contradicts this, however, by arguing that he did not learn of the Complaint until about two weeks after it was filed. (Dkt. No. 29 at 3.) DeLuca claims that Seare has had ample time to procure representation for the adversary proceeding;

---

11. That DeLuca admits that he tried to settle St. Rose's claim raises the question of whether DeLuca decided to represent Seare in the adversary proceeding, and whether Seare agreed to the representation. If DeLuca's actions constituted a decision to represent Seare, then that in turn raises the issue of

whether DeLuca appropriately withdrew from representation. Nonetheless, the court views the circumstances such that DeLuca's settlement efforts did not themselves establish that DeLuca represented Seare in the adversary proceeding.

Seare admitted to having contacted other attorneys but said that the fees are prohibitive. (Evid. Hr'g Tr. 24–25.) DeLuca also supports his lack-of-prejudice argument by stating that Seare was incapable of paying for additional services beyond the flat fee, in essence saying that even if he had been willing to represent Seare in the adversary proceeding, Seare would not have been able to afford him anyway. (*See id.* at 23:5–24:7.)

DeLuca alleges that Seare benefitted from the bankruptcy because the discharge eliminated nearly $137,000 in unsecured debt—"it remains difficult to argue that the elimination of $137,429.69 of unsecured debt is not a benefit that exceeds the $1,999.00 paid for the bankruptcy." (Bankr.Dkt. No. 27 at 13.) He argues that because the garnishments were stopped during the pendency of the bankruptcy, the Debtors' goals were at least partially realized. (*Id.* at 13.) DeLuca also alleges that Seare benefitted from the bankruptcy because his credit score was estimated to increase by approximately 102 points, based on reports by CIN Legal Data Services ("CIN"). (*Id.* at 31; Ex. O.[12])

DeLuca next asserts that the right to contract includes the right *not* to contract. (Bankr.Dkt. No. 27 at 9.) "It is certainly within the discretion of DeLuca & Associates to limit its representation of Debtor(s) that have a proven track record of defrauding their own lawyer, opposing counsel, and the Court." (*Id.; see* Evid. Hr'g Tr. 39:7–18.) After he learned of the fraud, he decided that "representation of Mr. Seare represented a liability" to his firm and himself personally because, he contends, under the Bankruptcy Abuse

Prevention and Consumer Protection Act ("BAPCPA"),[13] attorneys may be held liable for the frauds of their clients. 11 U.S.C. §§ 526–528, 707(b)(4) (2012). The court interprets this argument as a justification for DeLuca's affirmative refusal to represent DeLuca in the adversary proceeding, communicated in the letter on June 6, 2012, rather than the reasonableness of the unbundling in the first place, because DeLuca only learned of the fraud after representation had commenced. In spite of the "danger," DeLuca chose to represent Seare in settlement negotiations with St. Rose, after the OSC Hearing, because it seemed like the best way to extricate himself from the matter. (Evid. Hr'g Tr. 45:15–46:7.)

Finally, DeLuca tops off his defense with an argument under the United States Constitution. He claims that the "basic services bargained for between the parties did not include litigation or adversary proceedings." (Bankr.Dkt. No. 27 at 8.) To impose additional terms that were not bargained for would violate the Thirteenth Amendment, so he argues, because he would be obligated to perform work against his will and without compensation. (*Id.*) DeLuca asserts the "right to be free from involuntary servitude" and "enforced compulsory service of one to another." (*Id.* (citations omitted).)

## B. Seare's Contentions

The Debtors' first contention is that their primary goal was to permanently eliminate the wage garnishment and discharge the St. Rose Debt. (Evid. Hr'g Tr. 34:23–35:1; Dkt. No. 47 at 5.) Seare ex-

---

**12.** The evidence binder submitted by DeLuca before the Evidentiary Hearing contains printouts of the purported credit score estimations. The reports were not marked as an exhibit. However, the court admitted all of the proposed exhibits at the evidentiary hear-

ing and the CIN Legal Data Services Reports are hereby marked as Exhibit O. (Dkt. No. 35 at 47:12–13).

**13.** Pub.L. 109–8, 119 Stat. 23 (2005).

pressed concern that, depending on the outcome of the adversary proceeding, garnishment could start again. (Evid. Hr'g Tr. 34:23–35:1.) Tedoco stated that, if the garnishment were to continue, the Debtors would be "homeless and destitute." (Dkt. No. 47 at 2.) Seare admitted that the discharge of the other debts is a benefit, but was not the "main reason" the Debtors sought DeLuca's assistance. (Evid. Hr'g Tr. 35:3–4.) Although the debts of approximately 70 creditors were discharged, those creditors were not dunning the Debtors so Seare believed that there was no practical need to file for bankruptcy. (*Id.* at 27:12, 35:15–17.)

The Debtors claim that during their meeting with DeLuca, they "specifically and clearly" stated the nature of the Judgment to him and provided court documents for his review. (Dkt. No. 47 at 5.) Tedoco claims that they told DeLuca that the Judgment was from a sexual harassment case lost by Seare in which he had "embellished" e-mails. (*Id.*) Seare and Tedoco have both asserted that DeLuca affirmatively told them, even after hearing this information, that the St. Rose Debt was dischargeable. (*Id.* at 2, 5, 6; Evid. Hr'g Tr. 13:3–7.) She states that the only reason they hired DeLuca was because he assured them of the dischargeability of the St. Rose Debt. (Dkt. No. 47 at 5.) Seare testified that, although he understood the contract language concerning the nondischargeability of debts incurred through fraud, he relied upon DeLuca's alleged assurances of nondischargeability over the language in the Retainer Agreement. (Evid. Hr'g Tr. 15:13–16:13.) Moreover, Seare did not read the FAQ because DeLuca had already answered their questions. (*Id.* at 17:22–24.)

Seare claims that he understood that the flat fee did not cover adversary proceedings, but also that, at the time of the initial consultation, he did not even know what an adversary proceeding was. (*Id.* at 22:9–12, 33:4–7.) The Debtors assert that DeLuca did not explain anything about adversary proceedings at the consultation—either what they are or whether one was likely in their case. (*Id.* at 21:23–24; Dkt. No. 47 at 4.) According to Seare, DeLuca only told them that following the petition filing there would be a meeting of creditors and, 30 days later, the discharge. (Evid. Hr'g Tr. 33:14–23.) Seare claims that DeLuca did not talk to them about debts that might not be dischargeable during the initial consultation. (*Id.* at 33:24–34:3.)

The Debtors claim that, contrary to DeLuca's assertions, no one reviewed the Retainer Agreement with them. (Dkt. No. 47 at 5.) Tedoco asserts that, after meeting with DeLuca, she, Seare, and their two small children were put in a small room to sign and initial the Retainer Agreement. DeLuca's staff periodically checked to see if they had completed the forms, but no one sat with them to explain any part of the Retainer Agreement. (*Id.*) It was late in the day, around 5:00 p.m., and they felt rushed. (*Id.*)

Seare contends that DeLuca's nonrepresentation left him without any possibility of representation in the adversary proceeding. He testified that he consulted with two law firms and that he could not afford to engage either to represent him in the adversarial proceeding. (Evid. Hr'g Tr. at 24–25.)

Tedoco counters DeLuca's claim that the Debtors posed a danger by referencing the June 6 letter in which DeLuca informs the Debtors that he will not represent them in the adversary proceeding. (Dkt. No. 47 at 5–6.) In that letter, DeLuca mentions nothing that would indicate that he saw them as a threat. (*Id.* at 6.) Lastly, she argues that the letter is evidence that DeLuca engages in deceptive practices. (*Id.*

at 5–6.) The Debtors feel deceived because DeLuca advertises a full service practice yet refused to represent them in the adversary proceeding. (*Id.* at 5; Dkt. No. 29 at 3.)

The Debtors also claim that DeLuca did not properly communicate with them or keep them informed of the progress in their case. Throughout the representation, Tedoco claims, DeLuca's office was nonresponsive. (Dkt. No. 47 at 3–4.) The Debtors only spoke to DeLuca himself during the initial consultation; after that, even if they left messages for him, one of his staff returned the call. (*Id.*) Sometimes, the calls were only returned after leaving multiple messages. (*Id.* at 4.) The Debtors are also upset that the proposed stipulation and order that DeLuca received from St. Rose, approximately one month before St. Rose filed the Complaint, were not promptly forwarded to them. (Ex. H.) DeLuca did not even consult with the Debtors before informing St. Rose that he would not sign off on the proposed documents. (*See id.*)

## C. Seare's Credibility

There is a factual question about whether DeLuca affirmatively told the Debtors that the St. Rose Debt was dischargeable. Seare stated that DeLuca twice told him that it was. (Evid. Hr'g Tr. 15:7–12; Dkt. No. 29 at 2.) Seare also asserted that Tedoco told DeLuca that the St. Rose Debt was not from medical expenses, but rather that the garnishment stemmed from an order for attorney's fees resulting from the "embellished" e-mails. (Dkt. No. 29 at 2; *see* Dkt. No. 47 at 2.) At the Evidentiary Hearing, however, Seare contradicted this by saying that the fraud "was never brought up during [the consul-

tation]." (Evid. Hr'g Tr. 13:9.) Finally, Seare also stated that DeLuca did not tell the Debtors that the debt was *not* dischargeable or that there might be an adversarial proceeding. (*Id.*) Of these assertions, the court finds two facts: (1) the issue of Seare's fraud at the district court was not overtly discussed during the initial consultation; and (2) DeLuca did not affirmatively represent that the St. Rose Debt was dischargeable.

Although DeLuca does not remember meeting the Debtors, reading any district court documents, or what specifically was said during the consultation, the court does not believe Seare's testimony that DeLuca told the Debtors that the St. Rose Debt was dischargeable. The court finds it much more likely that he simply "thumbed through" the district court documents without paying them much heed, and that he did not affirmatively represent either way whether the debt was dischargeable. Similarly, his cursory review of the district court documents would not have led him to conclude that an adversary proceeding was likely.

The court finds that DeLuca failed to inquire about the nature of the Judgment during the consultation. If the Debtors did mention any of the facts underlying the Judgment, either the facts as presented did not clearly amount to fraud or DeLuca was not sufficiently attentive to reach that conclusion on his own. If he did know it was for fraud, then he surely would have told the Debtors that St. Rose would likely seek to have the debt found nondischargeable in an adversary proceeding.[14]

The court believes Seare's testimony that DeLuca did not explain anything about adversary proceedings during the

---

14. That debts incurred through fraud are nondischargeable is black letter bankruptcy law. With 11 years of experience practicing con-

sumer bankruptcy and having filed over 10,000 cases, DeLuca certainly knew this. (*See* Evid. Hr'g Tr. 36:23–37:6.)

consultation—what they are, whether one was likely in this case, or what the potential consequences could be. (*See* Evid. Hr'g Tr. 19:20–22.) Because DeLuca did not carefully review the district court documents, he did not realize that an adversary proceeding was a near certainty. Moreover, DeLuca does not have a standard practice of explaining adversary proceedings to prospective clients, other than to point out that they are not covered under the flat fee in his standard form retainer agreement. (*See id.* at 39:24–42:10.) Regarding the bankruptcy process, DeLuca only told the Debtors to expect the Section 341 meeting of creditors and that the discharge would follow. (*Id.* at 33:12–23.)

■ In sum, the court finds that DeLuca did not affirmatively represent that the St. Rose Debt was dischargeable. Nor did he explain anything about adversary proceedings, either in general or in relation to the Debtors' particular circumstances. He moved quickly and did not pay sufficient attention to the Debtors' individual goals and needs. His boilerplate forms and standardized approach belie a manner of legal practice that is all too common in consumer bankruptcy—an approach which may suffice for a lot of people, a lot of the time, but is prone to failing clients with circumstances that do not fit the mold of the prototypical consumer debtor.[15] While the court applies several ethical rules and sections of the Bankruptcy Code to DeLuca's conduct, each of which addresses related yet unidentical concerns, the root problem is a view of legal practice as a mass consumer good rather than a relationship founded on trust and individualized attention. The practice of law is a professional service, not a prepackaged, one-size-fits-all product.

## IV. LEGAL ANALYSIS

Resolution of this matter involves the intersection of contract law and the regulation of lawyers generally. DeLuca strenuously contends that he should be able to limit his representation of clients by contract. If he cannot, he asserts, he cannot run his practice prudently. Seare, on the other hand, wants DeLuca to follow the requirements binding on all lawyers. The contentions of both parties thus require a brief review of the nature of the legal profession.

### A. The Nature of the Legal Profession

Lawyers are not plumbers. They cannot indiscriminately dismiss clients at their whim, or even if their clients don't pay on time. Lawyers are professionals that owe fiduciary duties to their individual clients, and must continue to represent them even if initially rosy predictions turn sour. Am. Bar Ass'n, Section of Litig., Handbook on Ltd. Scope Legal Assistance 91 (2003) ("ABA Handbook"); *see* Restatement (Third) of Law Governing Lawyers § 16 (2000).[16]

---

15. *See* Hon. David S. Kennedy & Vanessa A. Lantin, *Litigation: Professionalism: Maintaining the Professionalism and Competence of a Lawyer in Bankruptcy Litigation When Compensation Becomes a Problem and Related Matters,* 13 J. Bankr.L. & Prac. 5 Art. 2 (2004) ("[I]t has been said that some consumer attorneys simply run so-called bankruptcy 'mills' where the primary objective is merely to maximize the economic return to the attorney fees with little attendant expense and time in what is negatively stereotyped as an administrative practice or a 'cookie cutter operation.' ").

16. While a precise definition of "professional" is difficult to pin down, *Black's Law Dictionary* defines a "professional" as "[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency." Black's Law Dictionary 1329 (Brian A. Garner ed., 9th ed. 2009); *see generally* Kevin F. Ryan, *Lex et Ratio* ...

A profession such as law is different from other occupations in that (1) "its practice requires substantial intellectual training and the use of complex judgments;" (2) it places clients in a position of trust because they typically cannot evaluate the quality of service; and (3) "the client's trust presupposes that the practitioner's self-interest is overbalanced by devotion to serving both the client's interest and the public good[.]" ABA BLUEPRINT, *supra* note 16, at 10. These traits justify the special privileges that lawyers, as members of a profession, enjoy; among the most noteworthy are a monopoly on representing others in court, and the enhanced ability to earn a livelihood that such a monopoly provides. *See id.*

■ The duties that a lawyer owes her client also flow from this understanding of what it means to a be a "professional"—that a lawyer's superior knowledge and training place clients in a position of trust and dependence such that the lawyer has obligations to individual clients beyond that of two equal parties to a transaction or contract. Instead, a lawyer is a fiduciary that owes the duties of candor, good faith, trust, and care to a client. ABA HANDBOOK 91.

The view of attorneys as professionals with enhanced duties to clients is not new or novel, as many courts have noted. "Attorneys must never lose sight of the fact that the profession is a branch of the administration of justice and *not a mere money-making trade.*" *In re Pair,* 77 B.R. 976, 978 (Bankr.N.D.Ga.1987) (internal quotation marks and citation omitted) (emphasis added). "[A]ttorneys are professionals. Individuals place their financial lives, and more, in their attorney's hands. Attorneys have ethical obligations to their clients regardless of the economic pressures which might exist." *In re Castorena,* 270 B.R. 504, 530–31 (Bankr.D.Idaho 2001).

The laws of ethics that lawyers must follow are premised on the lawyer's role as a professional—an agent and fiduciary of the client. *See* GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, 1 LAW OF LAWYERING § 1.6 (2012) ("introspection among lawyers about what values beyond obedience to law *ought* to inform behavior has taken the form of a public debate about "professionalism" (emphasis in original)).

## B. The Applicable Law and its Application to the Facts

### 1. Interplay Between State and Federal Law

■ Attorneys practicing in this court must adhere to the standards of conduct prescribed by the Nevada Rules of Professional Conduct. Local Rule IA 10–7(a). The Nevada Rules of Professional Conduct in turn are based on, and largely identical to, the ABA Model Rules of Professional

---

*Professionalism and the Practice of Law (Part One),* 27 VT. BAR. J. 7 (2001); AM. BAR ASS'N, " . . . . IN THE SPIRIT OF PUBLIC SERVICE:" A BLUEPRINT FOR REKINDLING OF LAWYER PROFESSIONALISM 10 (1986) ("ABA BLUEPRINT").

The American Bar Association ("ABA") has supported Dean Roscoe Pound's definition of a "profession" as " 'pursuing a learned art as a common calling in the spirit of public service—no less a public service because it may incidentally be a means of livelihood.' " *See* ABA BLUEPRINT 10 (quoting ROSCOE POUND, THE LAWYER FROM ANTIQUITY TO MODERN TIMES 5 (1953)). The ABA has rephrased this somewhat: "[a] professional lawyer is an expert in law pursuing a learned art in service to clients and in the spirit of public service; and engaging in these pursuits as part of a common calling to promote justice and the public good." AM. BAR ASS'N, SECTION ON LEGAL EDUC. & ADMISSION TO THE BAR, TEACHING AND LEARNING PROFESSIONALISM 6 (1986). Notably, the ABA defined "public service" as "representing *individual clients* and zealously advocating their interests in a professional manner." *Id.* at 6 n. 22 (emphasis added).

Conduct. The State of Nevada has not adopted the official comments to the ABA Model Rules; however, the comments "may be consulted for guidance in interpreting and applying the Nevada Rules of Professional Conduct, unless there is a conflict between the Nevada Rules and the ... comments." Nev. Rule of Prof'l Conduct 1.0A (2011).

## 2. Unbundling

Before assessing the specific rules and statutes at issue, a thorough discussion of unbundling is necessary. Unbundling is the practice of limiting the scope of services that an attorney will provide—"dividing comprehensive legal representation into a series of discrete tasks, only some of which the client contracts with the lawyer to perform." Amber Hollister, *Limiting the Scope of Representation: Unbundling Legal Servs.*, 71 Or. St. B. Bull. 9, 9 (2011). It is growing ever more common in general, and in family law and bankruptcy law in particular.[17] In bankruptcy cases, for example, the client and attorney may agree that not everything that could be done should be done by the attorney; some things might be left to the client or to other professionals. In effect, this *unbundling* excludes services that might aid or further the client's goals, but with the expectation and assumption that the items excluded can be accomplished by the client acting alone, or with another, presumably less expensive, attorney. The practice can benefit clients by giving them access to legal services that would otherwise be too expensive, and clients may feel a greater sense of satisfaction "flowing from the collaborative effort of achieving the client's desired goals." State Bar of Cal., Comm.

on Prof'l Responsibility and Conduct, An Ethics Primer on Ltd. Scope Legal Representation 10 (2004) ("Cal. Ethics Primer"); Richard P. Carmody, *Ethics and Prof'l Responsibility: What Your Appearance Obligates You to Do For Your Client,* in Am. Bankr.Inst., 21st Century Ethics 1054, 1064 (2012) ("ABI Ethics Report") [a report prepared for the American Bankruptcy Institute's 30th Annual Spring Meeting in National Harbor, Maryland on April 22, 2012]. Pro bono attorneys may be more willing to volunteer their time and effort if the representation has clear boundaries. ABA Handbook 133 ("By dividing work into smaller units, it encourages lawyers who have limited time to engage in pro bono work."). Attorneys who work for fees may likewise find the representation more predictable, as well as more profitable. *See id.* at 41 (quoting a long-time limited services practitioner, " 'coaching ... is a major profit center since we have no uncollectible fees and the overhead burden is reduced. . . .' "); Hon. Fern Fisher–Brandveen & Rochelle Klempner, *Unbundled Legal Servs.: Untying the Bundle in N.Y. State,* 29 Fordham Urb. L.J. 1107, 1114 (2002) (unbundling provides greater business opportunities).

The practice of unbundling also recognizes that the attorney-client relationship need not fit an identical mold for each client; parties have the right to contract for the services they deem appropriate to the situation. *See* ABA Handbook 72 ("[T]he lawyer and client should have the right to adopt any variant of limited representation that they wish. This is a contractual right."). Clients are given autonomy—the freedom to "choose one or more

---

17. *See* Michele N. Struffolino, *Taking Ltd. Representation to the Limits: The Efficacy of Using Unbundled Legal Servs. in Domestic Relations Matters Involving Litig.,* 2 St. Mary's J. Legal Mal. & Ethics 166, 176 (2012); Stepha-

nie L. Kimbro, *The Ethics of Unbundling,* 33 Fam. Advoc. 27 (2010); Thomas J. Yerbich, *Testing the Limits on Unbundled Representation,* 23 Am. Bankr.Inst. J. 8 (2004).

tasks that will involve legal representation and ... pay only for legal services related to those specific tasks." Struffolino, *supra* note 17, at 189. The courts may also benefit from unbundling; where the choice is between pro se litigation and limited representation, the latter should increase the quality of pleadings and better focus the issues. ABA HANDBOOK 11; *see* CAL. ETHICS PRIMER 1.

Unbundling raises concerns, however. The push to limit representation may come from the attorney, who often benefits from and has superior knowledge of the possible ramifications of excluding certain services.

> There are strong reasons for protecting those who entrust vital concerns and confidential information to lawyers.... Clients inexperienced in such limitations may well have difficulty understanding important implications of limiting a lawyer's duty. Not every lawyer who will benefit from the limitation can be trusted to explain its costs and benefits fairly.... In the long run, moreover, a restriction could become a standard practice that constricts the rights of clients without compensating benefits. The administration of justice may suffer from distrust of the legal system that may result from such a practice. Those reasons support special scrutiny of noncustomary contracts limiting a lawyer's duties, particularly when the lawyer requests the limitation.

RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 19 (2000).

There is a particular concern in consumer bankruptcy practice that attorneys will unbundle services that are essential or fundamental to bankruptcy cases and clients' objectives.

> A lawyer walks a perilous path in attempting to limit the services provided to bankruptcy debtors. Making an effective disclosure of the risks of such an arrangement, and obtaining informed consent, may be impossible in some cases. As noted, some lawyer services are so fundamental and essential to effective representation, no amount of disclosure and consent will suffice. Instructing a debtor to "go it alone" in any significant aspect of the bankruptcy case exposes counsel to possible criticism, and worse yet, a potential for sanction.

Hon. Jim D. Pappas, *Simple Solution = Big Problem*, 46 ADVOCATE (IDAHO) 31, 33 (2003) (citing *In re Castorena*, 270 B.R. 504 (attorney refused to appear at § 341 meeting and did not sign the pleadings he had prepared—a practice termed "ghostwriting"); *In re Egwim*, 291 B.R. 559 (representation limited to preparing petition, schedules, and related documents, and attending § 341 meeting; debtors appeared pro se in nondischargeability proceeding and hearing on motion for relief from stay); *In re Johnson*, 291 B.R. 462 (Bankr.D.Minn.2003) (failure to appear at § 341 meeting)); *see* ABI ETHICS REPORT 1065 ("A bankruptcy case is not like a 6–course meal that can be purchased *a la carte* " (emphasis in original)).

An additional concern is that limited representation may not afford a client full protection against direct contact by opposing counsel. NEV. RULE OF PROF'L CONDUCT 4.2 (2011) ("[A] lawyer shall not communicate about the subject of representation with a person the lawyer knows to be represented by another lawyer in the matter...."); Hollister, *supra*, at 11; *see* ABA HANDBOOK 107–13. If opposing counsel does not know the extent of a party's representation, opposing counsel may inadvertently communicate with the party about matters for which the party is represented. *See* Hollister, *supra*, at 11. Or worse, opposing counsel may initiate appropriate communication and purposely wander into matters that are off limits.

*See id.* Counsel acting in good faith may also be faced with the dilemma of how and whether to respond to an otherwise represented opposing party's contact to discuss a matter for which that party is not represented. *See In re DeSantis*, 395 B.R. 162, 166 (Bankr.M.D.Fla.2008). The ABA official comment to Model Rule 4.2, which is identical to Nevada Rule 4.2, states that communication with a represented party is prohibited even if "the represented person initiates or consents to the communication." ABA MODEL RULE 4.2 cmt. 3. Unless the attorney has either seen that party's retainer agreement, which is highly unlikely, or otherwise has knowledge of the relevant scope of representation, the attorney is unlikely to respond because to do so could risk a violation of Nevada Rule 4.2. *See In re DeSantis*, 395 B.R. at 166. There may also be a problem of keeping the client informed of matters arising in a case, such as when papers are served on counsel for a matter outside of her scope of services. *See* ABA HANDBOOK 79.

In spite of the concerns that unbundling raises, the ABA amended Model Rule 1.2(c) in 2002 to expressly allow limited-scope representation and provide a mechanism to regulate it. Struffolino, *supra*, at 215; AM. BAR ASS'N, ANNOTATED MODEL RULES OF PROF'L CONDUCT 38 (2011) ("ANNOTATED RULES"). The ABA's goal was to "encourage attorneys to provide some assistance to low- and moderate-income litigants who could not otherwise afford full representation." Struffolino, *supra* note 17, at 215 (citing AM. BAR ASS'N, STANDING COMM. ON THE DELIVERY OF LEGAL SERVS., AN ANALYSIS OF RULES THAT ENABLE LAWYERS TO SERVE PRO SE LITIGANTS 8 (2009)); ANNOTATED RULES 38 (citing AM. BAR ASS'N, LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROF'L CONDUCT, 1982–2005 at 55 (2006)). ABA Model Rule 1.2, which Nevada has adopted verbatim, states that "[a] lawyer may limit the scope of representation if the limitation is *reasonable under the circumstances* and the client gives *informed consent.*" NEV. RULE OF PROF'L CONDUCT 1.2(c) (2011) (emphasis supplied).[1819]

Shortly after the ABA amended the rule, the ABA published the *ABA Handbook*, a report on limited scope legal assistance. The *ABA Handbook* emphasizes

---

**18.** The former version of the rule stated, "A lawyer may limit the *objectives* of representation if the client consents after consultation." ABA MODEL RULE 1.2(a) (1988) (emphasis supplied). The rule was modified because only a client can limit the objectives, and the addition of the reasonableness standard was thought desirable. ANNOTATED RULES 38.

**19.** While not binding on this court, the state court rules of practice in Clark County impose affirmative duties on attorneys who provide unbundled services that the Nevada Rules do not.

(a) An attorney who contracts with a client to limit the scope of representation shall state that limitation in the first paragraph of the first paper or pleading filed on behalf of that client. Additionally, if the attorney appears at a hearing on behalf of a client pursuant to a limited scope contract, the attorney shall notify the court of that limitation at the beginning of that hearing.

(b) An attorney who contracts with a client to limit the scope of representation shall be permitted to withdraw from representation before the court by filing a Notice of Withdrawal of Attorney with the clerk's office. The Notice of Withdrawal of Attorney shall state that the attorney is withdrawing from the case because the attorney was hired to perform a limited service, that service has been completed, and shall include a copy of the limited services retainer agreement between the attorney and the client. The Notice of Withdrawal of Attorney shall also state that the client will be representing himself or herself in proper person unless another attorney agrees to represent the client....

Nev. 8th Jud. Dist. Ct. Rule of Practice 5.28 (2012).

**186**

that the majority of people in our nation are low and moderate income, and that often they cannot afford to pay lawyers in litigation. *Id.* at 3. Limited scope legal representation can make the judicial process fairer by providing greater access to justice. *Id.* at 3–4. The ABA quoted a long time limited-service practitioner for the proposition that unbundling should be client driven—"[i]n this legal relationship, 'the client is in charge of selecting one or several discrete lawyering tasks contained within the full-service package.'" *Id.* at 7 (quoting FORREST S. MOSTEN, UNBUNDLING LEGAL SERVS.: A GUIDE TO DELIVERING LEGAL SERVS. A LA CARTE 1 (2000)). Contracts of adhesion that unbundle legal services are undesirable as being lawyer driven and pose ethical challenges. *See In re Cuddy*, 322 B.R. 12, 18 (Bankr.D.Mass.2005) ("It looks and sounds like a contract of adhesion, with all of the unlovely baggage that phrase carries. It is contrary to my view of the higher obligation of an attorney.").

■ The *ABA Handbook* lists various factors that lawyers should consider when determining whether unbundling is appropriate,[20] and a series of specific steps that lawyers should take when considering whether to provide unbundled services to a particular client.[21] Although the court

does not adopt these measures, it agrees with the ABA's view that the focus should be client-centered; the decision to unbundle is specific to the particular circumstances of the client, the legal problem, and the court (or other decision-making forum). One-size-fits-all is not appropriate.

■ If limited representation is selected, "the lawyer must also alert the client to reasonably related problems and remedies that are beyond the scope of the limited-service agreement." *Id.* at 68. In a related ethics opinion, the Los Angeles County Bar Association put it this way,

> The attorney has a duty to alert the client to legal problems which are reasonably apparent, even though they fall outside the scope of retention, and to inform the client that the limitations on the representation create the possible need to obtain additional advice, including advice on issues collateral to representation.

*Id.* at 69 (quoting Los Angeles County Bar Assoc., Prof'l Responsibility and Ethics Comm., Ethics Op. 449 (March 1988)).

While the ABA takes the general position that unbundling is acceptable, and even desirable in some circumstances (so long as the ethical rules are followed), the

---

20. "[1] the capabilities of the client, [2] the nature [i.e., complexity] and importance of the legal problem, [3] the degree of discretion that decision-makers exercise in resolving the problem, [4] the type of dispute-resolution mechanism, and [5] the availability (or not) to the client of other self-help resources." ABA HANDBOOK 59, 61. For similar factors, see CAL. COMM. ON ACCESS TO JUSTICE, LTD. REPRESENTATION COMM., GEN. CIVIL LTD. SCOPE REPRESENTATION: RISK MGMT. MATERIALS (2007); CAL. COMM. ON ACCESS TO JUSTICE, FAMILY LAW LTD. SCOPE REPRESENTATION: RISK MGMT. MATERIALS (2004).

21. The steps relate to both general office practice and individual client interaction: (1) "[c]onsider providing self-help informational materials to prospective clients in your wait-

ing room, through the mail, or on-line;" (2) "stay within your practice area;" (3) perform a thorough and comprehensive "diagnostic" initial interview; (4) identify the client's problems and goals; (5) "[a]dvise the client about the available strategic and representational options, and help the client make selections;" (6) "[i]dentify what the lawyer will, and will not, do;" (7) "[i]dentify what the client can do;" (8) obtain informed consent from the client; (9) "[e]mbody all of the agreements and understandings, and the informed consent, in a written retainer agreement;" and (10) "[a]nticipate the need to revise the agreement by adding a flexible revision provision to it." ABA HANDBOOK 4–74.

American Bankruptcy Institute ("ABI") has gone a step further and tacitly endorsed the unbundling of representation in adversary proceedings in consumer bankruptcy cases (again, so long as the ethical rules are followed). Yerbich, *supra*, at 40. The ABI has not, however, expressly endorsed unbundling adversary proceedings. The ABI Ethics Report treats the ethics of unbundling as an open question, stating that the majority of courts that have addressed the issue frown on it because of the complexity of bankruptcy proceedings, and highlighting the aforementioned competing policy concerns of access to justice and representation that is less than competent because it fails to provide necessary services. ABI ETHICS REPORT 1055.

Nonetheless, several bankruptcy courts also have reached the conclusion that unbundling adversary proceedings is acceptable if the ethical rules are followed. *In re Castorena's* exclusion of adversary proceedings from the list of "fundamental and core obligations" that a consumer bankruptcy lawyer must provide imply that ad-

versary proceedings may be unbundled. 270 B.R. at 530. *In re Egwim* was more direct; after adding adversary proceedings to the list of "fundamental and core obligations," the court stated that such obligations may be unbundled if "all of the conditions required for the validity of the limitation" are fulfilled. 291 B.R. at 572–73. *In re Egwim* also supported charging extra fees beyond a flat fee for nondischargeability proceedings. *Id.* at 573. In sum, there seems to be a consensus that while unbundling raises various ethical concerns, unbundling in general, and in adversary proceedings in particular, is acceptable so long as the attorney follows the applicable ethical rules.[22]

 In light of the above, the court agrees that adversary proceedings can be unbundled, so long as the limitation complies with the applicable rules and statutes, and that a lawyer may charge additional fees for adversary proceedings. The analysis now turns to the applicable rules and statutes.

---

**22.** At least one bankruptcy court has developed a local rule to deal with the unbundling phenomenon. The U.S. Bankruptcy Court for the District of Maryland mandates:

> An attorney who files a petition in bankruptcy on behalf of a debtor ... will be counsel of record in all matters arising during the administration of the case, such as adversary proceedings ... In an individual case, representation will continue through discharge and continue as to any matter pending at the time of discharge. However, an attorney representing an individual debtor may exclude adversary proceedings ... provided that debtor's written acknowledgment of this limitation is filed with counsel's Federal Bankruptcy Rule 2016(b) statement.

Bankr.D. Md., Local Rule 9010–5.

Several districts indirectly discuss unbundling through their rules on what obligations an attorney incurs by appearing in a case. Some provide that attorneys who appear in a case must represent debtors in all related matters, including adversary proceedings.

Bankr.N.D. Ga., Local Rule 9010–4; Bankr. E.D.N.C., Local Rule 9011–1. Others exclude representation in adversary proceedings from those duties incurred merely by appearing in a case. Bankr.N.D. Ill., Local Rule 2090–5(B); Bankr.W.D.N.C., Local Rule 2091–1(a)(1) (in Chapter 7 cases, attorney may exclude representation in adversary proceeding if so provided in attorney's fee agreement). The local rules for this bankruptcy court fit into the latter category. "An attorney who appears in a case on behalf of a party is the attorney of record for any and all purposes except adversary proceedings until an order is entered permitting the withdrawal of the attorney or the case is closed or dismissed." Bankr.D. Nev., Local Rule 2014(a). This rule is not dispositive in DeLuca's favor though, as the issue here is not the scope of duties imposed by making an appearance, but rather the ethical duties surrounding unbundling. The rule does, however, lend support to the notion that unbundling of adversary services is an acceptable practice.

### 3. Nev. Rule of Prof'l Conduct 1.1—Duty of Competence

#### a. Legal Standard

 Under Nevada Rule 1.1, which is identical to ABA Model Rule 1.1, "[a] lawyer shall provide competent representation to a client . . . the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Nev. Rule of Prof'l Conduct 1.1 (2011). While there is no precise definition of competence, relevant factors include the lawyer's training, experience, and preparation. ABA Model Rule 1.1 cmt. 1; *In re Slabbinck*, 482 B.R. 576, 590 (Bankr.E.D.Mich. 2012). "Competent handling of a legal matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners." ABA Model Rule 1.1 cmt. 5. "The level of competency heightens as the complexity and specialized nature of the matter increase." *In re Slabbinck*, 482 B.R. at 590.

 Whether a lawyer fulfilled the duty of competence depends on the client's objectives. *See In re Egwim*, 291 B.R. 559, 569–73 (Bankr.N.D.Ga.2003); *In re Castorena*, 270 B.R. at 526–30; *cf. In re Slabbinck*, 482 B.R. at 590–94. The lawyer's duty is to competently attain the client's goals of representation. In the absence of a valid limitation on services, a lawyer must provide the bundle of services that are reasonably necessary to achieve the client's reasonably anticipated result, unless and until grounds exist for the lawyer's withdrawal. *In re Egwim*, 291 B.R. at 570.

 Nevada Rule 1.2(c), which is identical to ABA Model Rule 1.2(c), explicitly permits a lawyer to limit the scope of representation. Nev. Rule of Prof'l Conduct 1.2(c) (2011). The ABA comments shed light on the relationship between the duty of competence and agreements to limit the scope of representation. "An agreement between the lawyer and client may limit the matters for which the lawyer is responsible." ABA Model Rule 1.1 cmt. 5 (citing ABA Model Rule 1.2(c)). "Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation, the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation necessary for the representation." ABA Model Rule 1.2 cmt. 7 (citing ABA Model Rule 1.1).

 In other words, the duty of competence both informs and survives any and all limitations on the scope of services. *See* Cal. Ethics Primer 1–2. The baseline obligation to inquire into the facts and circumstances of a case and analyze the possible legal issues is not changed when the scope of services is limited. Struffolino, *supra* note 17, at 218. The level of inquiry and investigation required to discharge the duty of competence may be somewhat relaxed, however, under a limited scope agreement. *See* ABA Model Rules 1.1 cmt. 5, 1.2 cmt. 7; Struffolino, *supra* note 17, at 218. Whatever the precise definition of a "relaxed" duty to investigate may be though, the bottom line is that an agreement to unbundle services constitutes a breach of the duty of competence if the agreement excludes the services reasonably necessary to achieve the client's reasonable objectives. ABA Handbook 93–95.

"Generally, the duty of competence of Rule 1.1 is circumscribed by the scope of representation agreed to pursuant to Rule 1.2. However, a lawyer may not so limit the scope of the lawyer's representation as to avoid the obligation to provide meaningful legal advice, nor the

responsibility for the consequences of negligent action."

*Id.* (quoting Colo. Bar. Ass'n Ethics Comm., Formal Op. 101 (1998)). The duty of competence informs the agreement to unbundle by mandating the inclusion of those services reasonably necessary to achieve the client's reasonable objectives. NEV. RULE OF PROF'L CONDUCT 1.1 (2011). If those services are excluded, the client's goals cannot be met regardless of how knowledgeable, skilled, thorough, and prepared the lawyer may be. *Id.* The duty of competence survives the agreement in that the attorney must competently perform all services included in the agreement. NEV. RULE OF PROF'L CONDUCT 1.1. The client's objectives thus drive the analysis.

[1]- jectives, a lawyer must properly communicate with the client to understand the client's expectations, learn about the client's particular legal and financial situation, and independently investigate any "red flag" areas. *See* CAL. ETHICS PRIMER 1–2. A bankruptcy lawyer cannot assume that a client knows what a bankruptcy will or will not do for her. She may understand that bankruptcy eliminates some debts but is unlikely to know anything else about bankruptcy or even whether she wants or needs to file. For this reason, laypersons seek the advice of bankruptcy lawyers. *See Nichols v. Keller,* 19 Cal. Rptr.2d 601, 609, 15 Cal.App.4th 1672, 1686 (1993) ("A trained attorney is more qualified to recognize and analyze legal needs than a lay client, and, at least in part, this is the reason a party seeks out and retains an attorney to represent and advise him or her in legal matters.").

 A lawyer who holds himself out as a bankruptcy expert or specialist should explain the limits of the specialty. For example, a potential client that wants to discharge her student debts should be in- formed that student debts are nondischargeable absent undue hardship, and the lawyer should inquire into her circumstances to determine the likelihood of prevailing on a claim of undue hardship. The lawyer should perform the same inquiry and explanation for all potentially nondischargeable debts, such as those incurred through fraud.

While many laypersons have a general understanding that student debts are difficult to eliminate, they likely do not understand the undue hardship test. Similarly, their understanding of what debts constitute fraud and how those debts are treated by the Bankruptcy Code is certainly limited, and more likely nonexistent. A bankruptcy lawyer should inquire into a potential debtor's situation to determine if any of the debts were incurred by fraud and whether a nondischargeability proceeding is likely. The lawyer should also ascertain to what extent any nondischargeable debts are the driving force behind the potential client's decision to seek counsel. Again, the client's objectives drive the analysis, the purpose of which is to guide the client to reasonable objectives and determine which services are reasonably necessary to meet those objectives.

 The client's objectives may, and likely will, change through the course of a proper initial consultation. Because potential clients do not understand bankruptcy law, their pre-consultation expectations may be unreasonable or unachievable. The lawyer must "inquir[e] into and analy[ze] ... the factual and legal elements of the problem" ABA MODEL RULE 1.1 cmt. 5. The consumer bankruptcy attorney's role is to determine how bankruptcy may assist the client and whether some of the client's goals may be left unmet through bankruptcy, and effectively communicate this to the client. The client then decides whether and how to proceed.

The attorney must be on the same page with the client concerning the client's objectives. *See* HAZARD & HODES § 5.10. The attorney has the duty to communicate the advantages and limitations of filing for bankruptcy. *See id.* If the attorney and the client have different understandings of the goals of representation, viewed objectively, then the lawyer has not fulfilled the duty of competence. *See id.*

Put another way, the law of mutual mistake has no place in the retention of an attorney. The attorney bears the burden of failing to ascertain the client's objectives and/or failing to shape their objectives to conform to the remedies available under bankruptcy law. Once again, the lawyer is the expert, not the client.

 To summarize, a consumer bankruptcy attorney fulfills the duty of competence by providing the bundle of services reasonably necessary to achieve the client's reasonably anticipated result. The inquiry is fact-specific and depends on the client's individual circumstance. It also depends on the client's reasonable pre-consultation goals and how they may have been shaped or refocused through consultation with the attorney. While an attorney is not obligated to help a client meet patently unreasonable goals, the reasonable expectations of a layperson, in the absence of any information by an attorney that may refocus them, is the basis for the analysis.

### b. Application

 DeLuca's first failure—the root cause of his other failings—was to not define the goals of the representation, which resulted from a lack of communication with the Debtors at the initial consultation. He apparently treats all debtors the same, as if the discharge of all dischargeable debts is always the primary goal. Here, however, the Debtors' goal was to permanently stop the wage garnishment resulting from the St. Rose Debt. While a discharge of their other debts is of some benefit, the reason they sought counsel was the wage garnishment. DeLuca was aware of the garnishment and was given copies of various district court documents. He did not inquire into the nature of the Judgment, either at the initial consultation or thereafter. He apparently assumed that, because the debt was from a hospital, it was for medical services. He argues that any reasonable attorney would make the same assumption. The court disagrees. Competently attaining the Debtors' goals of representation mandated an independent inquiry into the nature of the Judgment.

DeLuca argues that the Debtors had the burden to inform him that the debt was incurred through fraud, as the Retainer Agreement states that debts incurred through fraud "do not go away" and requests copies of all lawsuits within the last two years. Because the Debtors knew that the Judgment was based on fraud, so DeLuca argues, the burden was on them to communicate that fact to him. DeLuca's argument fails, however, because he improperly placed the burden on the Debtors to make the legal conclusion that fraud, as defined in the Bankruptcy Code, includes the fraudulent act that Seare committed in the district court. A layperson cannot be reasonably expected to connect those dots—that a Judgment under Civil Rule 11 for fabricating evidence ("fraud on the court") may be nondischargeable as fraud under bankruptcy law. In addition, the Debtors complied with the request in the Retainer Agreement to provide copies of all lawsuits. While they did not give DeLuca hard copies of the entire district court docket, they provided sufficient documents to inform him of the existence of the district court case. Once DeLuca was

aware of a garnishment connected to a prior judgment, he had the affirmative duty to investigate.[23] DeLuca is the bankruptcy expert, not the Debtors.

Either DeLuca did not understand the Debtors' primary objective or he negligently assumed that the St. Rose Debt was dischargeable and thus the Debtors' objective would be met. Either way, he did not exercise the legal knowledge, skill, and thoroughness reasonably necessary for the representation. NEV. RULE OF PROF'L CONDUCT 1.1 (2011). He was not thorough, either in reviewing the documents given to him or in undertaking any independent review of the district court proceedings. He did not apply the knowledge and skill he has acquired through many years of consumer bankruptcy practice to the Debtors' needs.

Put another way, he did not sufficiently inquire into the factual and legal elements of the Debtors' problem—the wage garnishment and related legal issues concerning dischargeability. ABA MODEL RULE 1.1 cmt. 5. DeLuca failed his primary duty—ascertaining the Debtors' objectives. *See* ABA HANDBOOK 65–66 (the initial interview is " '[p]erhaps the most fundamental legal skill' of a lawyer in that it 'consists of determining what kind of legal problem a situation may involve, a skill that necessarily transcends any particular legal knowledge' " (quoting ABA MODEL RULE 1.1 cmt. 2)).

Based on the initial consultation, the Debtors could have reasonably anticipated that the St. Rose Debt would be discharged and that the garnishment would permanently cease. The Debtors did not likely expect that an adversary proceeding would be filed, especially since DeLuca did not even explain what an adversary pro-

ceeding was or the connection between nondischargeable debts and adversary proceedings. The Debtors moved forward without the clarity he had the duty to provide that the St. Rose Debt raised significant dischargeability concerns and was nearly certain to lead to an adversary proceeding. DeLuca counseled the Debtors to file a bankruptcy petition, which embroiled them in an adversary proceeding and threatened to deny the relief they sought in the first place.

██ In the attorney-client relationship, the client sets the objectives and the attorney determines the means to fulfill them in consultation with the client. NEV. RULE PROF'L CONDUCT 1.2(a) (2011). Without understanding the Debtors' goals of representation, DeLuca could not determine which legal services were reasonably necessary to attain those goals. Nor could the Debtors properly evaluate DeLuca's choice of means because the Debtors did not understand that filing a petition would likely result in an adversary proceeding—a proceeding in which DeLuca, the lawyer they reasonably understood to represent them for the entire bankruptcy matter, refused to represent them. The Debtors' choice to file was colored by DeLuca's failure to properly advise them. With sufficient information, the Debtors may have chosen not to file or sought an attorney that had a different fee structure concerning adversary proceedings.

DeLuca did not reach an understanding of the Debtors' goals or explain to them the challenges they were likely to face in trying to achieve those goals by filing for bankruptcy. In the absence of such guidance, he had the duty to offer the services reasonably necessary to achieve a perma-

---

**23.** The ramifications of his failure to investigate are also discussed below in relation to

Section 707(b)(4)(C).

nent cessation of the wage garnishment. Because an adversary proceeding was a near certainty in light of what DeLuca should have known at the time of the initial consultation—that the Judgment was based on fraud—representing the Debtors at an adversary proceeding was not only reasonably necessary to achieve their goal of stopping the garnishment but likely the only way to stop the garnishment. Consequently, DeLuca's decision to unbundle representation in adversary proceedings violated the duty of competence.

### 4. Nev. Rule of Prof'l Conduct 1.2(c)—Scope of Services

Unbundling is permissible only if "the limitation is reasonable under the circumstances and the client gives informed consent." Nev. Rule of Prof'l Conduct 1.2(c).

#### a. *Reasonable Under the Circumstances*

##### *(1) Legal Standard*

" 'Reasonable' . . . denotes the conduct of a reasonably prudent and competent lawyer." Nev. Rule of Prof'l Conduct 1.0(h) (2011). Like the term "profession," precisely defining "reasonable" is elusive. A leading treatise states that a limitation is reasonable if it is "not harmful to the client." Hazard & Hodes, *supra*, at § 5.10. The *Restatement* declares that a limitation is reasonable if the benefits supposedly obtained by the waiver, such as reduced legal fees or the ability to obtain a particularly able lawyer, could reasonably be considered to outweigh the potential risks posed by the limitation. Restatement (Third) of Law Governing Lawyers § 19 (2000). The *Restatement* also lists as relevant factors whether there were "special circumstances" warranting the limitation, whether it was proposed by the lawyer or client, and whether it is standard practice among lawyers in the client's local community but not in other communities. *Id.*

The ABA has stated that a limitation is unreasonable if it would violate another ethics rule or a provision of substantive law. Annotated Rules 40; *accord* Yerbich, *supra* note 17, at 8 ("What is reasonable generally boils down to a question of whether the lawyer's limited scope of responsibility would amount to a violation of the lawyer's ethical or legal obligations—a factual, situation-specific determination.").

Reasonableness is assessed at the time the client agreed to unbundled services; neither party has the benefit of hindsight. Nev. Rule of Prof'l Conduct 1.2(c) (2011) ("reasonable *under the circumstances* " (emphasis supplied)); Struffolino, *supra* note 17, at 225 ("These determinations must be made during the initial interview or soon thereafter . . . the conditions that existed at the initial consultation will govern any later reasonableness inquiry.") (citing ABA Handbook 91) ("Whether a service limitation is reasonable under the circumstances is judged at the time the client and lawyer enter into the representational agreement, *not retrospectively* " (emphasis supplied)). The ABA has stated that "the test is not whether, after the fact, the service proved to be of some use to the client, but rather whether, *at the time of the agreement,* a lawyer reasonably could have concluded that the service would be useful to the client." ABA Handbook 91 (emphasis in original); *see* Annotated Rules 41 (discussing *In re Egwim,* 291 B.R. 559; *In re Johnson,* 291 B.R. 462 (Bankr.D.Minn.2003)).

*In re Egwim* assessed the unbundling of adversary proceedings. It applied the prior version of ABA Model Rule 1.2(c), which does not have a reasonableness requirement, but the court did analyze the lawyer's conduct for reasonableness under the *Restatement.* "[T]he requirement in the Georgia Rule that the limitation not violate the requirement of competent rep-

resentation is equivalent, in substance, to the Restatement's principle that the terms of the limitation must be reasonable under the circumstances." *In re Egwim*, 291 B.R. at 571 (citing GA. RULE OF PROF'L CONDUCT 1.1 (identical in relevant part to NEV. RULE OF PROF'L CONDUCT 1.1)); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 19 (2000). In short, if the limitation constitutes a breach of the duty of competence, or any other ethical duty, then the limitation is unreasonable under the circumstances.

Because the nondischargeability proceeding in *In re Egwim* went to the "essential purposes of Debtors in filing the bankruptcy case," the unbundling appeared to violate the duty of competence and to thus be unreasonable. *Id.* Nonetheless, the court did not decide the issues of reasonableness and competence because counsel proceeded in good faith and there was no showing of adverse consequences to the debtors. *Id.* at 563. The point is that *In re Egwim* equated competence and reasonableness, and found that where an adversary proceeding goes to the "essential purpose" of the debtor in filing, the related unbundling is unreasonable. *Id.*; *cf. Hale v. U.S. Trustee*, 509 F.3d 1139, 1149 (9th Cir.2007) (affirming sanctions where bankruptcy attorney excluded the "critical and necessary service" of attending the Section 341 meeting).

*In re Johnson* held that unbundling the service of appearing at the Section 341 meeting of creditors is per se unreasonable, even if the clients agree to, and the Rule 2016(b) statement reflects, such limitation. 291 B.R. at 466. The court stated, "[t]he 341 meeting of creditors, it seems to the court, is … a core event in a bankruptcy case.... it is difficult to fathom a basic, original retainer not including counsel's attendance and representation at the 341 meeting, *in every case.*" *Id.* at 468

(citing *Hale v. U.S. Trustee (In re Basham)*, 208 B.R. 926, 932 (9th Cir. BAP 1997) (emphasis in original); *In re Bancroft*, 204 B.R. 548, 551 (Bankr.C.D.Ill. 1997); *Bone v. Judah (In re Josey)*, 195 B.R. 511, 514 (Bankr.N.D.Ga.1996); *In re Castorena*, 270 B.R. at 530). Put another way, representation at the Section 341 meeting is mandatory to fulfill the duty of competence; it is part of the bundle of services that are reasonably necessary to achieve the client's reasonably anticipated result—a discharge. At the time the client agreed to exclude representation at the Section 341 meeting, the lawyer reasonably could have concluded that the service would be useful to the client. *See* ABA HANDBOOK 91.

The court follows *In re Egwim* and *In re Johnson*, both of which essentially applied the ABA's formulation of the test. Reasonableness is coextensive with competence. *In re Egwim*, 291 B.R. at 571; Yerbich, *supra* note 17, at 8. As discussed above, a limitation on services violates the duty of competence if the unbundled service is reasonably necessary to achieve the client's reasonably anticipated result. The ABA's phrasing of the reasonableness test is slightly different, "whether, *at the time of the agreement*, a lawyer reasonably could have concluded that the service would be useful to the client," but the ultimate analysis is the same. ABA HANDBOOK 91 (emphasis in original).

■■■■ Thus, a limitation on services is not "reasonable under the circumstances" if, in light of the relevant information that the lawyer knew or should have known at the time the retainer agreement was formed, the unbundled service was reasonably necessary to achieve the client's reasonably anticipated result. NEV. RULE OF PROF'L CONDUCT 1.2(c) (2011). A limitation is *per se* unreasonable if it violates a rule of ethics or provision of

substantive law, such as Section 707(c)(4) (discussed below).[24] The *Restatement's* cost-benefit analysis—whether the benefits supposedly obtained by the limitation could reasonably be considered to outweigh the potential risks posed by the limitation—is instructive but not dispositive. RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 19 (2000). Two additional factors are whether the client has the ability to handle the unbundled matter without legal assistance, and the complexity of the legal matter at issue. *See* Struffolino, *supra* note 17, at 222–23; CAL. ETHICS PRIMER 2 ("[I]t is wise to avoid limited scope representation in very sophisticated and/or complicated litigation."). The weighing of these factors also mirrors the competency analysis, as "[t]he level of competency heightens as the complexity and specialized nature of the matter increase." *In re Slabbinck*, 482 B.R. at 590. As with competency, the determination of reasonableness is fact-specific and depends on the client's particular situation and objectives.

### (2) Application

■ Turning to DeLuca's decision to unbundle adversary proceedings, the first issue is timing—when the decision to exclude adversary proceedings was made. There are only three options; the decision was either made before DeLuca met with the Debtors, during the initial consultation, or sometime during the representation of the Debtors in the main bankruptcy case. DeLuca's use of boilerplate contracts that exclude adversary proceedings from the flat fee indicates that the decision to unbundle was made before DeLuca ever met the Debtors. The court does not find fault with the practice of using pre-prepared forms that limit the scope of services in-

cluded in a flat fee, but the decision to unbundle must be reasonable under the circumstances. Boilerplate forms with limited services may be used only if the unbundled services are not reasonably necessary to achieve a particular client's objectives. As aptly demonstrated by the Debtors in this case, not all clients are the same. By treating them all the same, the decision to unbundle was effectively made before DeLuca ever met the Debtors. This is unreasonable and violates Nevada Rule 1.2(c).

DeLuca argues that the Retainer Agreement clearly excludes adversary proceedings. (Bankr.Dkt. No. 27 at 14; Evid. Hr'g Tr. 41:20–42:2.) He is correct that it excludes adversary proceedings from the flat fee, but not that it excludes them altogether. The Retainer Agreement states that services rendered to address allegations of nondischargeability, and representation in adversary proceedings, "may require additional fees," but it does not state that DeLuca may decide not to provide such services at all. (Ex. G at 7.) Seare admitted that he understood that DeLuca would not represent him for free in adversary proceedings, and that the flat fee did not include such services, which indicates that Seare thought that DeLuca would represent him in adversary proceedings (albeit for additional fees). (Evid. Hr'g Tr. 22:9–12.)

■ Even if, however, the decision to unbundle adversary services were made during the initial consultation, that decision would be unreasonable because an adversary proceeding was a near certainty. Had DeLuca even cursorily investigated the nature of the Judgment, he would have uncovered that it was based on Seare's fraudulent conduct. DeLuca should have

---

**24.** The court does not express an opinion of whether a limitation that does not violate any ethical rules is automatically reasonable.

known that representing Seare in an adversary proceeding was reasonably necessary to achieve the Debtors' reasonably anticipated result—a discharge of the St. Rose Debt. The Debtors' expectation of a complete discharge was reasonable in light of the facts that (1) DeLuca did not inform them otherwise; and (2) they are not bankruptcy experts.

The *Restatement's* cost-benefit analysis weighs strongly against DeLuca. The supposed benefit afforded to the Debtors by the limitation would be affordable legal representation in the main bankruptcy case by a bankruptcy expert. DeLuca's failure to explain the nature and likelihood of adversary proceedings, however, deprived the Debtors of relevant information that could have led them to seek another expert attorney who would have included adversary proceedings in the flat fee. The value of the benefit is thus difficult to assess. Similarly, DeLuca's failure to investigate the Judgment and properly inform the Debtors meant that neither could adequately value the potential risk posed by the limitation. The risks of unbundling adversary proceedings in this case are now clear, but at the time the Retainer Agreement was formed, the benefits and potential risks could not be meaningfully compared. Not only could the Debtors not weigh the costs and benefits (see informed consent, below), DeLuca could not either because he had not investigated the Judgment.

Also weighing against DeLuca is that bankruptcy, and adversary proceedings in particular, are highly complex. *See County of Santa Cruz v. Cervantes (In re Cervantes)*, 219 F.3d 955, 961 (9th Cir.2000); *In re Egwim*, 291 B.R. at 572; *In re Cuddy*, 322 B.R. at 17. Bankruptcy law is federal, yet state law plays a prominent role. Questions concerning the bankruptcy court's jurisdiction and constitutional authority are perplexing. *See Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011); *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553 (9th Cir. 2012). Among other things, a debtor seeking only a Chapter 7 discharge must navigate a complicated array of forms and schedules, the Section 341 hearing, decisions of whether to reaffirm or redeem debts, possible motions for relief from stay, and coordinating with and responding to the court and the trustee. Potential allegations of nondischargeability add another layer of complexity; the pro se then must deal with a civil lawsuit in federal court, and understand the relationship between the adversary proceeding and the main bankruptcy case.

Although Seare has been involved in at least one prior court proceeding, there is no reason to believe that he is any more knowledgeable about bankruptcy than the average layperson. A party proceeding pro se in an adversary proceeding faces an uphill climb.

"[P]ro se litigants [in adversary proceedings], in a very real sense can be a danger to themselves. Without an understanding of the importance of facts in issue, the applicable law, or why their discharge has even been challenged, they often flounder helplessly at trial, aimlessly pursuing meaningless points and arguments.... [T]o proceed pro se presents the very real possibility that the creditor will prevail for the sole reason that its opponent did not understand the facts in issue or how to defend against the allegations raised."

*In re Cuddy*, 322 B.R. at 17 (quoting *Colter v. Edsall (In re Edsall)*, 89 B.R. 772, 774 (Bankr.N.D.Ind.1988)). Although Seare is aware of why St. Rose challenges the discharge of its debt, that fact alone does not give Seare the substantive and

procedural knowledge necessary to effectively mount a defense. Now that the matter is settled, the validity of his defense cannot be known. Nonetheless, proceeding without counsel put him at a significant disadvantage. Because bankruptcy is a complex area of law and pro se litigants in adversary proceedings face long odds, an attorney seeking to demonstrate that a limitation on services was reasonable has a high burden. DeLuca has failed to meet that burden.

Returning to the issue of timing, DeLuca did not communicate his intent to not represent Seare in the adversary proceeding until June 5, 2012. (Exs. H, I.) The circumstances in early June were that (1) St. Rose had filed the Complaint, on May 24, 2012; (2) prior to the Complaint, DeLuca's office was aware of St. Rose's intent to enforce its rights under the Judgment because St. Rose had communicated as much at the Section 341 meeting in March and in the proposed order and stipulation sent to DeLuca in April; (3) the Debtors had obtained their discharge, on May 30, 2012; and (4) the Debtors were confused about whether the St. Rose Debt had been discharged. (Dkt. No. 1; Bankr. Dkt. No. 20; Ex. H.)

 Unlike during the initial consultation, by June the Complaint had already been filed. To say the least, representing Seare in the adversary proceeding was reasonably necessary to achieve his objective of discharging the St. Rose Debt. In fact, prevailing in the adversary proceeding was the only way that Seare could discharge the St. Rose Debt. Unbundling this service after the Complaint was already filed was patently unreasonable and violated Nevada Rule 1.2(c).[25]

The unbundling of adversary proceedings was unreasonable in light of the Debtors' circumstances and objectives. If the decision to unbundle were made prior to meeting the Debtors, it is per se unreasonable because it could not have contemplated the Debtors' circumstances. If the decision were made during the initial consultation, it is also unreasonable. DeLuca knew of the Debtors' goal of eliminating the St. Rose garnishment. Had he investigated the nature of the Judgment, he would have known that an adversary proceeding was a near certainty and representing the Debtors in the adversary was reasonably necessary to achieve their objectives. Excluding adversary proceedings was thus a violation of the duty of competence and unreasonable under the circumstances. If DeLuca decided to unbundle in early June, once the Complaint was filed, then the decision was unreasonable for the simple reason that the Debtors only chance of discharging the St. Rose Debt was to prevail in the adversary proceeding. Moreover, bankruptcy is a highly complex area of law; the Debtors are at a significant disadvantage proceeding without legal representation; and the risk of facing an adversary proceeding outweighed the benefits of obtaining affordable counsel. Lastly, the unbundling was DeLuca's idea, which runs contrary to the ABA's guidance that unbundling should be client-driven. ABA HANDBOOK 7; *see* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 19.

#### b. Informed Consent

#### (1) Legal Standard

] The second element of Nevada Rule 1.2(c)—informed consent—is "the

---

25. Seare may have a misrepresentation claim against DeLuca based on the language of the Retainer Agreement, which stated that adversary proceedings would incur additional fees, and DeLuca's later outright refusal to represent

sent Seare in the adversary proceeding. DeLuca held out that he would negotiate later for services in adversary proceedings, although he may not have ever had the intent to perform them.

agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Nev. Rule of Prof'l Conduct 1.0(e) (2011). The analysis involves two questions: (1) whether the information disclosure was sufficient; and (2) whether the consent was valid. Struffolino, *supra* note 17, at 225. One bankruptcy court has aptly stated,

> [d]isclosure involves the attorney explaining to a debtor the nature of the bankruptcy process, what problems could or will be encountered, how those problems should be addressed, and the risks or hazards, if any, associated with those problems. Consent involves a clear understanding on the part of the debtor as to these factors and the possible results of a debtor proceeding without an attorney being present.

*In re Bancroft,* 204 B.R. at 552.

■ Not only must the risks of proceeding pro se in a particular situation be explained, but more broadly, the attorney must advise the client of the risks *inherent* in unbundling legal services. Hazard & Hodes § 1.2:401. "The chief risk is that purchasing a cheap solution may result in a poor solution that will have to be undone later at a greater cost." *Id.* Also, the disclosure cannot be limited to the two options of either including or excluding a particular legal service. The lawyer must explain other reasonable alternatives, such as retaining a different lawyer that may have a different fee structure. *See Healy v. Axelrod Const. Co. & Defined Ben. Pension Plan & Trust,* 155 F.R.D. 615, 620 (N.D.Ill.1994). "It is less than sincere to suggest that the attorney is offering a reasonably priced alternative to usual legal representation, when there is no showing the alternatives were explained by the attorney to the debtors and the debtors made a knowledgeable decision." *In re Castorena,* 270 B.R. at 528 (quoting *In re Bancroft,* 204 B.R. at 552). "Unless debtors truly understand what they bargain away, the bargain is a sham." *Id.* at 529.

■ While an attorney need not perform an exhaustive survey of his peers' fee schedules, the client is not adequately informed if she thinks that an attorney's unbundling practice is the only option she has to obtain legal services. This depends largely on the client's sophistication and ability to shop the legal marketplace, but nonetheless the attorney has an affirmative duty, at the very least, to explain that not all attorneys unbundle services in the same way. *See In re Slabbinck,* 482 B.R. at 588 ("[T]he lawyer should have ... given the client the opportunity to seek counsel who may offer representation on other terms. It is not the client's responsibility to know, without it being explained, that adversary proceedings may occur and the consequences arising from them." (internal quotation marks and citation omitted)).

The lawyer must explain the advantages and disadvantages of having counsel's assistance during the pendency of the case. The average layperson has little understanding of the substance and procedure of bankruptcy and is unlikely to be able to meaningfully weigh the benefits of reduced-cost representation with the risks of unbundled services—both the inherent and situation-specific risks. *In re Castorena* went so far as to state that informed consent is highly suspect when any services are unbundled by consumer bankruptcy attorneys,

> In order to make an informed decision, the client must understand what might be faced in the bankruptcy, and the risks associated with representing himself in handling those contingencies. Many lawyers find themselves surprised

by what can arise in an otherwise "simple" bankruptcy case. The reported decisions of this and other bankruptcy courts make it clear that, even in garden variety consumer chapter 7 cases, counsel for debtors and those who might be characterized as their adversaries (creditors, or occasionally the trustee) sometimes have distinctly polar views of what is permissible and what is not. The ability to adequately explain the lay of the bankruptcy landscape, including all its variations, contingencies and permutations, in order to obtain a truly informed consent is suspect.

*In re Castorena,* 270 B.R. at 529.

Regarding nondischargeability proceedings in particular, *In re Egwim* took a similar view:

> There may be an unusual case where an informed debtor could make a reasonable and intelligent decision to engage an attorney to file a chapter 7 bankruptcy petition on a limited basis that excludes services such as representation in discharge or dischargeability litigation; counsel would bear a heavy burden to demonstrate that this case is one of them. . . .

*In re Egwim,* 291 B.R. at 581.

*In re Slabbinck* cited a Michigan ethics opinion that discussed whether a Chapter 7 debtor could exclude representation with respect to a reaffirmation agreement; the disclosures must, "at a minimum," include information on the "risks to the client that the proposed limitations would create, as well as the technical aspects, legal ramifications and material risks of reaffirming a dischargeable debt." 482 B.R. at 589 (internal quotation marks and citation omitted). Again, the overriding purpose is the communication of risk. *See* CAL. ETHICS PRIMER 2.

*In re Slabbinck* addressed the issue of unbundling pre- and post-petition services and held that the debtor did not give informed consent to exclude post-petition services because there was no evidence on the adequacy of the attorney's disclosures. *Id.* at 595–96. The clients unequivocally stated that they consented to the unbundling, but that was insufficient without any proof of the content of the disclosures. *Id.* The court could not ascertain whether the attorneys had explained (1) that the failure to file certain post-petition forms and schedules would result in the denial of discharge; (2) the consequences of dismissal and serial filings on the automatic stay; (3) that a failure to attend the § 341 meeting would mean no discharge; and (4) that failure to cooperate with the trustee could also mean no discharge. *Id.* In short, there was no evidence that the risks of going it alone were communicated to the debtor.

Likewise, *In re Collmar* held that the debtor did not give informed consent to unbundle reaffirmation agreements from the scope of services. *In re Collmar,* 417 B.R. 920, 924 (Bankr.N.D.Ind.2009). The court applied Indiana Rule 1.2(c), which is identical to Nevada Rule 1.2(c), and held that informed consent was not obtained because counsel did not explain the reaffirmation process to the debtor, the advantages and disadvantages of having counsel during that process, the consequences of not having that assistance, or the alternatives to the unbundling, including the option of hiring other counsel who would not unbundle reaffirmations from the scope of services. *Id.*

The nature of the required disclosure is fact-specific and depends on the client's particular situation. For example, the risks of proceeding without representation in adversary proceedings depend on the likelihood of an adversary proceeding, which in turn depends on the nature of the

client's debts and the identity of the creditors (e.g., whether a particular creditor has a propensity for filing adversary complaints).

The ABA also has endorsed the view that attorneys have a dual obligation to explain the inherent risks of unbundling and the specific risks of a particular case.

Although there is no one-size-fits all explanation for clients, it might include a general description of limited representation, a specific description of the type of limited representation the lawyer will provide to the client, what the lawyer and client each will do, what the lawyer will *not* do under the agreement (a little redundancy here helps), whether the lawyer will enter an appearance and when and how the lawyer will withdraw or strike that appearance (making it clear the client will be required to support the withdrawal), whether and how the lawyer and client can modify the initial agreement if they need or want to do so, and identification of the risks of limited representation.

ABA HANDBOOK 71 (emphasis in original). The lawyer must start with the big picture—explaining what unbundling is—and then go into more detail about the risks of limited representation and the responsibilities of the lawyer and the client.

■ The explanation must also clearly indicate that the client has responsibilities under a limited scope retainer agreement. A layperson may not understand that he is responsible for any unbundled services. This is especially true if the lawyer does not explain the likelihood of a service being needed. A client may reasonably assume that a service is excluded because it is unlikely to be necessary, or that it could be included later (usually for an additional fee). "Because the client-lawyer relationship is created by consent, the critical issue for the attorney in a limited scope

representation is that the client fully understand and agree to what the attorney will do, and, more importantly, what the attorney will not do." *Id.* at 92 (internal quotation marks and citation omitted).

■■ The explanation must convey that not all of the risks of limited representation may be apparent from the outset; consequently, "the lawyer should counsel the client about those risks and problems which are typical in cases of the type presented by the client." *Id.* at 72 n. 229 (citation omitted). A lawyer must advise about the general if the specific is uncertain. A lawyer cannot use the uncertainty of future legal proceedings to shield himself from explaining the risks that may arise, as best known when representation commences.

■ The primary goal of the information disclosure is to communicate the risks of limited representation. *See* HAZARD & HODES § 5.10. Only when the risks are properly communicated, in language comprehensible by the client, is the client capable of valid consent. To enable herself to appreciate the risks, formulate a proposed scope of services that properly accounts for the risks, and communicate to the client the pros and cons of proceeding with some services unbundled, the lawyer must first perform a thorough client interview. In some instances, independent investigation into the client's circumstances is necessary. Because the risks occur at different levels of scale—the macro when considering challenges that all lawyers and clients face under a limited scope arrangement, and the micro when assessing a client's particular situation—a lawyer can only understand the risks by careful examination of the client's situation and objectives. A client is much more likely to understand the risks of limited representation when they are specific to his

case; the average layperson is unlikely to be able to "connect the dots" between generalized risks, the services he needs to achieve his goals, and whether any unbundled services put him at risk of not being able to fulfill those goals.

■ A particular risk of limited representation is that the client may find herself in a position of diminished bargaining power if unbundled services become necessary during the course of representation. The lawyer must alert the client to "foreseeable collateral problems" that may arise in the course of representation. *See* Struffolino, *supra* note 17, at 233.

> A lawyer should not enter into an agreement whereby services are to be provided up to a stated amount when it is foreseeable that more extensive services will probably be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction.

ABA MODEL RULE 1.5 cmt. 5. Part of being informed is knowing what can reasonably be expected to occur and whether any of the unbundled services are reasonably necessary to deal with those future events.

■ Because the required information that a lawyer must provide is situation-specific, boilerplate disclosures in contracts of adhesion are highly suspect. *Cf. In re Cuddy*, 322 B.R. at 18 (finding ethical problems with contracts of adhesion that unbundle legal services). Such disclosures may sufficiently communicate what unbundling is and the general risks associated with it, but a boilerplate disclosure cannot be expected to capture the specific risks that a client will face if her lawyer does not perform certain services. Even if the disclosure were crafted in a way that adequately addressed specific risks, lawyers are ill advised to entirely rely on it to comply with their duty to inform. To in-

terpret the terms of an adhesion contract, courts look to the full circumstances of the parties to determine their expectations; the situation of the principals—their relative bargaining power—and context of the transaction are therefore relevant. *Spychalski v. MFA Life Ins. Co.*, 620 S.W.2d 388, 392 (Mo.App.1981); *see* RESTATEMENT (SECOND) OF CONTRACTS § 200 (1981). The terms of the boilerplate disclosure will not necessarily override other communications between the lawyer and client. In sum, a boilerplate disclosure is almost certainly ineffective to properly convey the information necessary under Nevada Rule 1.2(c), and lawyers should affirmatively communicate the particular risks of unbundling in the circumstance rather than relying on what could be an unpredictable interpretation of the terms of a boilerplate disclosure.

The *Annotated Rules* discusses two cases to shed light on what constitutes informed consent. ANNOTATED RULES 41. In *Johnson v. Board of County Commissioners*, 85 F.3d 489, 493–94 (10th Cir. 1996), the court held that separate representation is permissible for a government official sued in his individual and official capacities, but not solely on the basis of convenience for the attorney. Where the government retains counsel to represent an official only in his official capacity, the court was concerned that the official may not understand that his individual interests are not necessarily protected by the official capacity representation, and that there may be conflicts between the defenses he may have in his separate capacities. *Id.* at 494. The court recognized the "need for sensitivity" in this area and the potential for ethical violations and malpractice claims. *Id.* The court embraced a procedure whereby counsel must notify the district court and the official of the potential conflict. The district court then deter-

mines if the official fully understands the potential conflict; if so, the official can choose joint representation. The official must also be informed that it is advisable that he obtain independent counsel on the individual capacity claim.

There, the attorney did not consult with the official about the mechanics of a § 1983 claim nor the exposure he faced in his individual capacity. *Id.* Thus, the official could not have consented and the attorney's decision to represent him only in his official capacity violated Rule 1.2(c). In short, the client-official chooses whether to proceed with joint or separate representation. The district court plays a direct role by determining whether the information is sufficient to enable a valid consent. The purpose of the disclosure is to communicate risk in a way that the client-official can understand.

In *Indianapolis Podiatry, P.C. v. Efroymson,* the issue was whether a limited-scope agreement was so limited that it precluded conflict-of-interest disclosures that would have otherwise been required. 720 N.E.2d 376 (Ind.Ct.App.1999). The court said very little about the limited scope agreement itself, other than that it was "at best minimally adequate." *Id.* at 381. However, the court stated that the "extent of disclosure to a client required when the scope of representation is being limited is similar, if not identical, to that required in the context of a conflict of interest" and that "meaningful consent must be based on full, objective, and unbiased advice." *Id.* at 381 n. 4 (internal quotation marks and citation omitted).

The ABA Annotated Rules's discussion of several ethics opinions reiterates much of what is discussed above—that the attorney must clearly explain (1) the limitations on representation (including what services are and are not included), (2) the probable effect of limited representation on the client's rights and interests, (3) whether it is foreseeable that more extensive services will be needed, (4) that the limitation cannot so restrict representation as to render it inadequate to meet the client's goals, and (5) that an attorney hired by a third-party insurer must communicate the limited representation to the client. ANNOTATED RULES 41 (discussing Colo. Ethics Op. 101 (1998); ABA Formal Ethics Op. 96–403 (1996); N.Y. City Ethics Op. 2001-3 (2003)).

There is also a concern that a client will sign anything that is put in front of him or her. Clients likely believe that an attorney is acting in the client's best interest, and that, because the attorney is an expert, whatever limitations the attorney proposes are appropriate to the situation. Simply put, "[s]ome clients will sign anything; it is [the lawyer's] responsibility to make sure the client understands the situation." Beverly Michaelis, *Unbundling in the 21st Century: How to Reduce Malpractice Exposure While Meeting Client Needs,* 70 OR. ST. BAR BULLETIN 44, 45 (2010) (discussing OR. RULE OF PROF'L CONDUCT 1.2(c) (2010), which is identical to NEV. RULE OF PROF'L CONDUCT 1.2(c) (2011)).

*In re Cuddy* employed the useful metaphor of a professional swim instructor taking on a new student with the understanding that, for the initial fee, the instructor will lead the student to the pool, show her how to enter the water, and explain the basic elements of swimming. 322 B.R. at 17–18. If there is a serious problem, however, the student is on her own unless she pays more fees. *Id.* at 18. "Even if this message is clearly conveyed to the student, if the desire to swim is strong enough (just as if the need for the bankruptcy remedy is strong enough in the debtor *in extremis* ) the student will accept the terms." *Id.* (emphasis in original). *In re Cuddy* was concerned about contracts of adhesion

202

that purport to demonstrate informed consent but merely serve to impose a limitation on services that a client feels powerless to reject. *See id.*

Partly for this reason, the consent itself must be valid. The validity of the consent depends largely on the sufficiency and complexity of the information conveyed by the attorney, but it is an independent inquiry. The form of consent must demonstrate not only that the client received the necessary information, but that the client understood the import of the limitation on services. While it is impossible to subjectively ascertain with certainty that a particular client *understood* the risks of a limited scope agreement, there must be sufficient indicia of understanding for a court to objectively determine that the client's consent was based upon a competent and thorough understanding of the risks of the agreement and the client's responsibilities under the agreement.

Consent is presumed valid in the absence of any red flags, such as indications of incompetence. *See In re Schaeffer*, 824 S.W.2d 1, 4 (Mo.1992) ("Consent [to a conflict of interest] purportedly given by a client whom the lawyer should reasonably know lacks capacity to consent is ineffective. The client must be of sufficiently sound mind . . . to understand the consequences of consent, and to exercise judgment in the matter. *See* Restatement of the Law Governing Lawyers, Tentative Draft 4, § 202 cmt. g(ii) (April 10, 1991). The lawyer must examine the individual client's ability to give consent voluntarily. . . . Vulnerability of the client must be taken into account."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 cmt. c(ii) (2000) ("Consent [to a conflict of interest] purportedly given by a client whom the lawyer should reasonably know lacks capacity to consent is ineffec-

tive."). So long as the disclosures were sufficient, then the client is presumed to have based her decision on the information contained in the disclosures and assumed the risks. However, the greater the complexity of the substantive and procedural issues, in particular the potential complexity of the unbundled service that the client may have to handle on her own, the higher the burden on the lawyer to demonstrate that the client understood what she agreed to. For example, where adversary proceedings are unbundled, the lawyer must present sufficient evidence for the court to infer that the client understood the nature of an adversary proceeding, the likelihood of one arising in the client's case, the client's pro se responsibilities if one were to be filed, and the potential risks to the client's interests depending on the probable outcomes.

For matters as complex as bankruptcy, a signed retainer agreement that merely states that certain proceedings are excluded from the flat fee is unlikely to suffice. *Cf. In re Cuddy*, 322 B.R. at 15 (holding that a retainer agreement's general "pay-or-we-will quit" language was not specific enough to comply with a local rule that required bankruptcy attorneys to represent debtors in adversary proceedings unless the debtors expressly agreed otherwise). There must be a demonstrated link between the excluded services and the client's understanding of the import of excluding those particular services in relation to the client's particular circumstance.

While not required under the ethical rules, the court agrees with the ABA that the consent should be in writing. ABA HANDBOOK 71; NEV. RULE OF PROF'L CONDUCT 1.5 (2011) ("The scope of the representation . . . shall be communicated to the client, preferably in writing. . . ."). Attorneys protect themselves by putting the

agreements in writing. In the absence of an explicit written agreement, a lawyer and client may be left in a "he said, she said" dilemma if there is a dispute about the nature of the unbundling agreement. *See* ABA MODEL RULE 1.5 cmt. 2; Struffolino, *supra* note 17, at 234 (citing *Smith v. Statewide Grievance Comm.*, CV94–053–98–40, 1995 WL 231108, at *1, *4 (Conn.Super.Ct.1995) (holding that the clients did not consent to limited scope representation in a telephone conversation despite the attorney's testimony otherwise)); *see* CAL. ETHICS PRIMER 4 (malpractice exposure increases dramatically when agreement not memorialized in writing). A written agreement, however, may not itself be sufficient to prove that the attorney disclosed the necessary information to the client. *Benet v. Schwartz*, No. 93 C 7295, 1995 WL 117884, at *4 (N.D.Ill.1995) ("[T]he fact that defendants and [their lawyer] executed the retainer agreement does not establish that defendants satisfied Rule 1.2(c)'s disclosure requirement.").

To summarize, the informed consent inquiry under Nevada Rule 1.2(c) comprises two issues. The first is whether "the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed [limited services agreement.]" NEV. RULE OF PROF'L CONDUCT 1.2(c) (2011). While adequacy is situation-specific, the overriding purpose is to communicate the risks of limited scope representation to the client in language that the client understands. To that end, based on the client's specific goals and circumstances, the attorney must explain (1) the nature of the bankruptcy process; (2) the foreseeable problems that will arise in the debtor's case, including but not limited to their complexity and likelihood of occurring; (3) the inherent risks of unbundled legal services; (4) the foreseeable risks to the client arising from the unbun-

dled services at issue (and that not all risks are apparent at the outset of the case); (5) the advantages and disadvantages of having counsel's assistance with the unbundled services; (6) the likelihood of the client having to perform any of the unbundled services pro se; (7) the client's responsibilities under the agreement; and (8) the reasonably available alternatives, including but not limited to the fact that not all attorneys unbundle services in the same manner. The client must have enough information to make a reasoned decision as to whether the limited scope agreement with a particular attorney is in the client's best interest.

The second issue is whether the "agreement by a person"—the consent itself—was valid. NEV. RULE OF PROF'L CONDUCT 1.2(c) (2011). The court does not articulate a black-and-white standard. When the information disclosure was adequate and the client is competent, consent is presumed valid in the absence of any red flags. *See In re Schaeffer*, 824 S.W.2d at 4. The attorney must demonstrate a link between the excluded services and the client's understanding of the related disclosures such that the court can objectively determine that the client understood the import of proceeding without full representation. The evidentiary burden on the attorney is heightened as the complexity of the legal matter and the likelihood of needing the unbundled service increase.

#### (2) Application

██ DeLuca failed both aspects of informed consent. First, he did not adequately communicate the material risks of unbundling adversary proceedings—either in general or in the Debtors' situation—or the available alternatives to such unbundling. Without adequate information upon which to base a decision, valid consent was impossible. Second, the means of the con-

sent—initialing and signing DeLuca's contract of adhesion—did not sufficiently demonstrate that the Debtors understood the import of proceeding without representation in adversary proceedings.

Turning first to the information that De-Luca communicated to the Debtors, the court points out that DeLuca's failure to properly understand their goals and the details of their situation—i.e., the nature of the Judgment—rendered adequate communication impossible. DeLuca argues that the Debtors gave informed consent by executing the contract. Because DeLuca has no affirmative recollection of what transpired at the initial consultation, the court views the terms of the Retainer Agreement as the primary "communication" by DeLuca concerning the unbundling of adversary proceedings.[26] The parties disagree about whether anyone from DeLuca's office reviewed the Retainer Agreement with the Debtors. The Debtors argue that they were made to review the contract alone while Deluca testified that his standard office practice is to have a paralegal "go through" the contract paragraph-by-paragraph. The court believes that this is DeLuca's standard practice, but there is no evidence that such review ever occurred with the Debtors. DeLuca does not keep records of which paralegal meets with each client. Even if the meeting occurred, however, DeLuca's failure to explain what a paralegal actually explains to prospective clients indicates that the added "communication" would not be a material improvement over the terms of the Retainer Agreement itself.

The precise question is whether the Retainer Agreement itself constituted adequate communication. The Retainer Agreement states that debts incurred through fraud "do not go away," that the flat fee does not include representation for nondischargeability claims and adversary proceedings, and that such services would cost extra. Together, these clauses do not adequately communicate the material risks of proceeding without representation in adversary proceedings, or even that DeLuca may decide not to represent the Debtors in adversary proceedings. The Retainer Agreement separately lists nondischargeability claims and adversary proceedings as services that require additional fees; fraud is mentioned in another section. The contract's essential downfall is that the prospective client is left to connect the dots—that a debt incurred through fraud (a debt that "does not go away") is raised in a claim of nondischargeability that is litigated in an adversary proceeding. The Debtors had to make yet another analytical connection—that the district court judgment constituted fraud under the Bankruptcy Code.

Turning next to what DeLuca *failed* to communicate, he first failed to adequately explain the Chapter 7 process, in light of the near certainty that a nondischargeability proceeding would arise. He only told the Debtors to expect the Section 341 meeting and that the discharge would follow. For garden-variety cases, this may be sufficient, but where the Debtors' primary goal is to eliminate a garnishment connected to a fraud judgment, that explanation falls woefully short. That the process would include a claim of nondischargeability was reasonably foreseeable. In the absence of researching the Judgment, DeLuca was unable to explain the likelihood of such a claim nor its complexi-

---

**26.** The court does not consider the FAQ as a meaningful "communication" because there is no evidence that the Debtors ever looked at it, either alone or with guidance from DeLu-

ca. Seare testified that he did not look at the FAQ because DeLuca had answered all of his questions. (Evid. Hr'g Tr. 12:22–24.)

ty—in other words, how the Debtors' goals could be impeded by such a claim.

There is no evidence to indicate that DeLuca explained the inherent risks of unbundling legal services to the Debtors, or that such explanations are his standard practice. To the contrary, DeLuca appears to use standard form contracts of adhesion—clients either accept on his terms or reject his services outright. The Debtors could not have known that the bundle of services included in the flat fee was unlikely to meet their objectives. DeLuca neither explained the risks of going it alone in adversary proceedings in general, nor what particular risks the Debtors faced. He did not communicate the high likelihood of having to represent themselves pro se or find another lawyer, which would have been evident had he reviewed the Judgment. Without such explanation, the Debtors could have reasonably agreed to exclude adversary proceedings on the thought that such proceedings were unlikely to occur. That the Debtors made this probability calculation is difficult to believe though because DeLuca did not even explain what an adversary proceeding was.

The Retainer Agreement does not explain that the Debtors have heightened responsibilities related to the unbundled services. Like any layperson, the Debtors may have understood that DeLuca was not providing certain services, but this is not the same as understanding exactly what actions and duties comprise the unbundled services and that the Debtors must assume those duties. The lawyer is the expert and has the duty to explain what a client must actually do to make up for a gap in representation. The Debtors did not know what they did not know. In no sense were they informed such that they could make a meaningful decision about whether to proceed with DeLuca or seek other counsel.

They could have reasonably concluded that all Chapter 7 attorneys operate in the same way—that unbundling adversary proceedings is the norm. The Debtors were deprived of the opportunity to obtain additional legal advice, whether from DeLuca or another attorney, about how to deal with an issue which they were unaware of at the time of the initial consultation. The "communication" was inadequate because the Debtors could not have understood the material risks of proceeding without representation in adversary proceedings; nor could they have known the possible advantages of seeking counsel that structured his or her services differently. NEV. RULE OF PROF'L CONDUCT 1.2(c) (2011).

Finally, the form of the consent itself was insufficient. The Debtors merely initialed and signed a standard form contract that reflected neither their understanding of what services were unbundled nor their particular circumstance. The court cannot objectively determine that the Debtors understood the risks of proceeding with limited representation. Even if the Debtors knowingly consented to the precise terms of the Retainer Agreement, however, that consent only extended to additional fees for representation in adversary proceedings. Consent is only presumed if the "communication" was adequate and there were no red flags. The complexity of bankruptcy is itself a red flag in that an attorney must meet a high bar to demonstrate that a client understood the consequences of excluding adversary proceedings. *See In re Egwim*, 291 B.R. at 572. Although the precise boundaries of what constitutes adequate communication and valid consent are difficult to define, by no measure did DeLuca comply.

Because the "communication" was inadequate to explain the material risks of the unbundled services and the available alter-

natives, and the consent itself was invalid, the Debtors did not give their informed consent and DeLuca violated Nevada Rule 1.2(c).

### 5. NEV. RULE OF PROF'L CONDUCT 1.5—Attorneys' Fees

#### a. Legal Standard

■ Under Nevada Rule 1.5(b),

[t]he scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

NEV. RULE OF PROF'L CONDUCT 1.5(b) (2011). Subsection (b) of the Nevada Rule is identical to its ABA corollary. *Id.;* ABA MODEL RULE 1.5(b). "In a new client-lawyer relationship, . . . an understanding as to fees and expenses must be promptly established." ABA MODEL RULE 1.5 cmt. 2. The lawyer should explain, again, preferably in writing, "the general nature of the legal services to be provided, the basis, rate or total amount of the fee and whether and to what extent the client will be responsible for any costs, expenses or disbursements in the course of the representation." *Id.*

■ Lawyers are thus required to openly discuss fees in advance—the services covered by the fees, how the fees are calculated, and how the fees may change. *See* NEV. RULE OF PROF'L CONDUCT 1.5(b) (2011); HAZARD & HODES § 8.2. "For unsophisticated clients in particular, this communication and counseling may be almost as important as the lawyer's preliminary legal advice . . . Only .after the lawyer provides such disclosure can a client's agreement to pay a specified fee be consid-

ered truly voluntary." HAZARD & HODES § 8.2.

■ The lawyer's communication concerning her fees must be in plain English. The client must be in a position to understand what the lawyer will do for the agreed upon fees, and, of equal importance, what the lawyer will *not* do. Simply put, the client must know what he bargained for.

#### b. Application

■ DeLuca violated Nevada Rule 1.5 because he did not sufficiently explain the scope of services covered under the flat fee and the scope of services available for additional fees. NEV. RULE OF PROF'L CONDUCT 1.5 (2011). The Debtors were not regular clients of DeLuca, and thus he was required to communicate the scope of representation and the basis of his fees. *Id.* Because the Debtors were fairly unsophisticated in legal matters, and had no prior experience in bankruptcy, they cannot be said to have voluntarily agreed to pay the fees without adequate explanation by DeLuca. *See* HAZARD & HODES § 8.2. The problem is not that the Retainer Agreement did not list the fee amount or services to be provided; it did list them.

Rather, the problem is threefold. First, the listed services are described in legal jargon rather than plain English. Seare understood that "adversary proceedings" were excluded, but did not even know what they were. He also knew that "nondischargeability allegations" were excluded, but similarly may not have known what they were.

Second, the Debtors did not know the likelihood that they would need to pay for additional services. Without knowing the probability of an adversary proceeding, they did not know "to what *extent* [they] would be responsible for any costs, ex-

penses or disbursements in the course of the representation." ABA MODEL RULE 1.5 cmt. 2 (emphasis added). The Debtors' "extent" of responsibility is not just what they have to pay for, but how likely it is that they would have to pay for it and the probable cost. The Debtors could have reasonably believed that the only services they needed were included in the flat fee and/or that any additional services would be minimal and relatively inexpensive.

Because an adversary proceeding for the St. Rose Debt was reasonably foreseeable at the time the Debtors agreed to the fee structure and DeLuca did not adequately explain this eventuality to the Debtors, he improperly unbundled the adversary proceedings from the flat fee. *Id.* cmt. 5. He unfairly placed them in the position of having to bargain for additional legal services "in the midst" of the adversary proceeding. *Id.; see* ABA HANDBOOK 9–10 ("[S]ome people pay lawyers an amount sufficient to buy the limited representation they need, but as a deposit for full-service representation. When the client cannot pay a later installment of the full-service fee, the lawyer discontinues the legal work. This leaves the client, lawyer, and court frustrated, and converts the former client into a pro se litigant."). The risk of being in this position is borne out by the fact that they met with several attorneys—all of which were too expensive because they would have needed to get up to speed on the case and this complex adversary proceeding. (*See* Evid. Hr'g Tr. 24–25.)

Third, DeLuca changed the basis of his fees without advance warning to the clients. NEV. RULE OF PROF'L CONDUCT 1.5(b) (2011). The Retainer Agreement does not state that he may decide not to represent the Debtors in adversary proceedings, only that such services would incur additional fees. The Debtors agreed to pay about $2,000 for an attorney, that,

for additional fees, would handle nondischargeability claims and adversary proceedings. Part of the basis for the $2,000 fee was the availability of additional services if needed. By deciding later not to represent the debtors at all, he essentially changed the basis for his fees. *Id.*

Viewed objectively, the Debtors did not understand what they bargained their money for. Without an understanding of what an adversary proceeding was, the likelihood of one occurring, and what it could cost them, they could not have known that the approximately $2,000 they agreed to pay did not include the scope of services reasonably necessary to achieve their goal. DeLuca was in a position to modify his standard form contract to include representation in adversary proceedings, or properly explain the financial risks of excluding such representation. Because he failed to investigate the Judgment, however, he could not see the necessity of making such accommodations. With proper information, the Debtors could have chosen to pay the $2,000 in spite of the risks, or sought another attorney. Their choice to pay $2,000 cannot properly be labeled as voluntary. *See* HAZARD & HODES § 8.2.

For these reasons, DeLuca violated Nevada Rule 1.5.

### 6. NEV. RULE OF PROF'L CONDUCT 1.4— Communication with Clients

#### a. Legal Standard

Even if a limitation is reasonable and the client gives informed consent, the lawyer is not discharged of all duties surrounding the unbundled matter. The lawyer still has the duty to communicate under Nevada Rule 1.4, which is identical in pertinent part to ABA Model Rule 1.4. NEV. RULE OF PROF'L CONDUCT 1.4 (2011); ABA MODEL RULE 1.4 (2002). The lawyer shall "[r]easonably consult with the client

about the means by which the client's objectives are to be accomplished; . . . [k]eep the client reasonably informed about the status of the matter; [and] . . . [p]romptly comply with reasonable requests for information. . . ." NEV. RULE OF PROF'L CONDUCT 1.4(a) (2011); *see* Yerbich, *supra* note 17, at 8 ("Even if it may be outside the scope of the limited representation, an attorney has a continuing ethical obligation to respond to or forward to the debtor, as may be appropriate, any subsequent inquiries or information that the attorney receives.").

### b. Application

██ DeLuca first violated Nevada Rule 1.4 by failing to reasonably consult with the Debtors about the means to achieve their objectives. NEV. RULE OF PROF'L CONDUCT 1.4(a)(2) (2011). Because he did not understand that their primary goal was to permanently stop the garnishment, to the near exclusion of discharging other debts, a meaningful consultation about which means best served the Debtors' goals was rendered impossible.

DeLuca's failure to forward the proposed stipulation and order that he received via fax from St. Rose one month before St. Rose filed the Complaint also violated Nevada Rule 1.4. Even if DeLuca had properly unbundled representation in the adversary proceeding, which he did not, he had the ongoing duty to "keep the client reasonably informed about the status of the matter." NEV. RULE OF PROF'L CONDUCT 1.4(a)(3) (2011). There is no doubt that the Debtors' "matter" included a judgment creditor's communication concerning the possible settlement of its claim. To make matters worse, DeLuca told St. Rose that he would not sign off on the proposed stipulation without consulting first with the Debtors, a consultation which apparently never happened. (Ex. H.)

██ DeLuca also violated Nevada Rule 1.4 by failing to timely respond to requests for information by the Debtors. NEV. RULE OF PROF'L CONDUCT 1.4(a)(4) (2011). Tedoco argues that throughout the representation, DeLuca's office was nonresponsive and failed to keep the Debtors informed of the progress in their case. (Dkt. No. 47 at 3–4.) She further argues that DeLuca's staff returned messages that specifically requested for DeLuca to call. (*Id.*) Even when DeLuca's office returned the call, it often took two or three messages to prompt DeLuca's office to act. (*Id.*) While a busy attorney is not required to return all calls directed at him or her, especially if the matter can be addressed by a staff member, the primary relationship is between the attorney and client. DeLuca could not simply ignore the requests for direct communication. The Debtors paid for DeLuca's ongoing professional legal counsel, not just for a one-time meeting.

The Debtors were in a position of trust and relied upon DeLuca to guide them through a new, complex process. Failing to keep them sufficiently informed was unacceptable. Although the court doubts the Debtors' credibility overall, the court finds their argument about DeLuca's failure to communicate convincing. DeLuca's record in this case and office policies indicate an inattention to detail and poor client communication. He fails to log which paralegal in his office reviews the retainer agreements with each prospective client. Twice in this case, he incorrectly filed his briefs on the bankruptcy docket instead of the adversary docket. More importantly, he failed to serve copies of his briefs on the Debtors until after the Evidentiary Hearing, even though the court ordered him to serve his Reply Brief on the Debtors immediately after the OSC Hearing.

For these reasons, DeLuca violated Nevada Rule 1.4

### 7. The Bankruptcy Code

#### a. Section 707(b)(4)(C)

##### (1) Legal Standard

"The signature of an attorney on a [Chapter 7] petition ... shall constitute a certification that the attorney has ... performed a *reasonable investigation* into the circumstances that gave rise to the petition...." 11 U.S.C. § 707(b)(4)(C) (2012) (emphasis added). Section 707(b)(4)(C) is one of the provisions that BAPCPA added to the Code in 2005 to impose new duties on attorneys representing consumer debtors. *In re Moffett*, 2012 WL 693362, at *2 (Bankr.C.D.Ill.2012). The Ninth Circuit Court of Appeals has not articulated the nature of the "reasonable investigation" that attorneys must perform.

The Bankruptcy Appellate Panel of the Ninth Circuit has discussed Section 707(b)(4)(C) on only one occasion. *In re Kayne*, 453 B.R. 372, 381–82 (9th Cir. BAP 2011). The BAP affirmed the bankruptcy court's finding that an attorney's failure to list a promissory note payable to the debtor, and the income received therefrom, as an asset on the debtor's schedules violated Section 707(b)(4)(D) and Rule 9011. *Id.* at 385. Under Section 707(b)(4)(D)—the sister provision to Section 707(b)(4)(C)—an attorney's signature "constitute[s] a certification that the attorney has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect." 11 U.S.C. § 707(b)(4)(D) (2012).

The BAP equated the analyses under Section 707(b)(4)(C) and Rule 9011—" 'a debtor's attorney has a duty, *equivalent to that under [Rule] 9011* to perform a reasonable investigation into the circumstances giving rise to the documents before filing them in a Chapter 7 case' " *Id.* at 381 (quoting *In re Withrow*, 405 B.R. 505, 511–12 (1st Cir. BAP 2009) (emphasis added) ["*In re Withrow* (BAP)"], *aff'g In re Withrow*, 391 B.R. 217 (Bankr.D.Mass. 2008) ["*In re Withrow* (Bankr.Ct.)"] ).[27] In other words, Rule 9011 is "enhanced" by the BAPCPA additions of Section 707(b)(4)(C) and (D), and "evinces a policy that a debtor's attorney exercise independent diligence and care in ensuring that there is evidentiary support for the information contained in the client's bankruptcy schedules." *In re Kayne*, 453 B.R. at 385 (citing *In re Dean*, 401 B.R. 917, 924 (Bankr.D.Idaho 2008)). Likewise, the attorney must exercise independent diligence to investigate the facts underlying the client's desire to file for bankruptcy to comply with Section 707(b)(4)(C). The "reasonable investigation" required under Section 707(b)(4)(C) is coterminous with the "reasonable inquiry" required under Rule 9011. *See id.*

Other courts, the ABA, and the Collier bankruptcy treatise have come to the same conclusion. *In re Withrow* (BAP), 405 B.R. at 511; *In re Triepke*, 2012 WL 1229524, at *4 (Bankr.W.D.Mo.2012); *In re Alessandro*, 2010 WL 3522255 (Bankr. S.D.N.Y.2010); *In re Dean*, 401 B.R. at 924; Am. Bar. Ass'n Section of Bus. Law,

---

**27.** *Kayne* relied in part upon a "Sense of Congress" provision included in BAPCPA instructing Sections 707(b)(4)(C) and (D) to be read together with Rule 9011. *Id.* at 381 n. 6 (citing Pub.L. 109–8 § 319 (2005) ("It is the sense of Congress that rule 9011 ... should be modified to include a requirement that all documents ... submitted to the court ... by debtors who represent themselves and debt-

ors who are represented by attorneys be submitted only after the debtors' attorneys have made reasonable inquiry to verify that the information contained in such documents is (1) well grounded in fact; and (2) warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.")).

Task Force on Attorney Discipline, *Attorney Liability Under Section 707(b)(4) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 61 Bus. Law 697, 703 (2006) ("*ABA Attorney Liability*"); 6 Collier on Bankruptcy ¶ 707.05[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) ("[I]t is not quite clear that [Section 707(b)(4)(C) ] . . . adds anything to current Rule 9011. One difference is the use of the phrase 'reasonable investigation' rather than 'reasonable inquiry.' However, the pre-existing text of both the Moore's Federal Practice discussion of [Civil] Rule 11 and this treatise's discussion of Rule 9011 use the words 'inquiry' and 'investigation' interchangeably.").

The ABA has stated that "[a]s a standard, 'reasonable investigation' should be governed by the case law interpreting and applying the 'reasonable inquiry' standard under Rule 9011." *ABA Attorney Liability* 697. The ABA accepted one bankruptcy court's articulation of an attorney's reasonable pre-filing investigation duties under Rule 9011 for the purposes of Section 707(b)(4)(C):

> "The duty of reasonable inquiry imposed upon an attorney by [Civil] Rule 11 and by virtue of the attorney's status as an officer of the court owing a duty to the integrity of the system requires that the attorney (1) explain the requirement of full, complete, accurate, and honest disclosure of all information required of a

debtor; (2) *ask probing and pertinent questions designed to elicit full, complete, accurate, and honest disclosure of all information required of a debtor;* (3) check the debtor's responses in the petition and Schedules to assure they are internally and externally consistent; (4) demand of the debtor full, complete, accurate, and honest disclosure of all information required before the attorney signs and files the petition; and (5) seek relief from the court in the event that the attorney learns that he or she may have been misled by a debtor."

*Id.* at 704 (quoting *In re Robinson*, 198 B.R. 1017, 1024 (Bankr.N.D.Ga.1996)) (emphasis added). Notably, the second requirement places an affirmative duty on the attorney to take steps to ensure that the client is providing complete and accurate information. Merely relying on what the debtor provides is insufficient. The attorney must engage with the client and not just take a passive role; "attorneys must exercise not only supervision, but, more importantly, professional judgment that derives only through *personal involvement in the case and evaluation of the client's needs.*" *Id.* at 705 (emphasis added).

*In re Withrow* (Bankr.Ct.) articulated a similar standard, which included a requirement that the attorney "employ such external verification tools as were available and not time or cost prohibitive...." 391 B.R. at 228;[28] *accord Fleming Sales Co.,*

---

**28.** The entire *In re Withrow* (Bankr.Ct.) standard: "(1) did the attorney impress upon the debtor the critical importance of accuracy in the preparation of documents to be presented to the Court; (2) did the attorney seek from the debtor, and then review, whatever documents were within the debtor's possession, custody or control in order to verify the information provided by the debtor; (3) did the attorney employ such external verification tools as were available and not time or cost prohibitive ...; (4) was any of the information provided by the debtor and then set forth in the debtor's court filings internally inconsistent—that is, was there anything which should have obviously alerted the attorney that the information provided by the debtor could not be accurate; and (5) did the attorney act promptly to correct any information presented to the Court which turned out, notwithstanding the attorney's best efforts, to be

*Inc. v. Bailey,* 611 F.Supp. 507, 519 (N.D.Ill.1985) ("Litigation lawyers have a broad responsibility under [Civil] Rule 11 and the [Model Rules of Professional Conduct]: to confer with the client about the facts—and not to accept the client's version on faith, but to probe the client in that respect."); *In re Triepke,* 2012 WL 1229524, at *5; Collier ¶ 707.05[1]. *In re Withrow* (Bankr.Ct.) then synthesized the inquiry to one question: "[d]id the attorney do his or her level best to get it right? More can not, and should not, be asked of any attorney. And when an attorney appears to have provided less, an inquiry under Rule 9011 and § 707(b)(4)(C) is proper." 391 B.R. at 228.

■ Like the reasonableness inquiries under the ethical rules, reasonableness under Section 707(b)(4)(C) is also examined at the time the petition was filed (without the benefit of hindsight). *ABA Attorney Liability 703; see Hamer v. Career College Ass'n,* 979 F.2d 758, 759 (9th Cir.1992) (discussing Civil Rule 11).

■ To summarize, Section 707(b)(4)(C) serves as an enhancement to Rule 9011.[29] The "reasonable investigation" under this section is indistinct from the "reasonable inquiry" under Rule 9011. To comply with Section 707(b)(4)(C), the attorney must perform an objectively reasonable investigation into the circumstances giving rise to the petition, assessed at the time the petition was filed. 11 U.S.C. § 707(b)(4)(C) (2012). The attorney cannot take al of the client's assertions at face value nor rely solely upon the information provided by the client. The

attorney may rely on her client's objectively reasonable assertions, but where the client-provided information is internally (or externally) inconsistent, materially incomplete, or raises "red flags," the attorney is obligated to probe further—by asking questions, obtaining additional documents, or by some other means. Again, the attorney is the expert and cannot rely upon a client's limited understanding of what constitutes the "complete" or "necessary" information that the attorney must have nor what information is or is not relevant to the client's particular situation.

### (2) Application

■ As with the ethical violations discussed above, DeLuca's violation of Section 707(b)(4)(C) flows from his failure to investigate the nature of the Judgment. The Debtors told him of the circumstance giving rise to the petition—the wage garnishment. They even provided documents from the district court proceeding. DeLuca certainly was aware of the district court action, as the case name and case number are listed on the Debtors' Statement of Financial Affairs. DeLuca's reasonable next step would have been to investigate the Judgment supporting the garnishment. He could have done this by asking questions or, more effectively, downloading a copy of the Judgment from PACER, the district court's readily-available electronic docketing system. *See In re Withrow* (Bankr.Ct.), 391 B.R. at 227–28. Instead, he merely flipped through the court documents that the Debtors gave him and as-

inaccurate." *In re Withrow,* 391 B.R. at 227–28.

**29.** Section 707(b)(4)(C) is described as an "enhancement" to Rule 9011 because the overarching purpose of both is to deter attorney misconduct and because the review standard for Section 707(b)(4)(C) relies upon Rule 9011

precedent. A Rule 9011 violation, however, is not a necessary element for a violation of Section 707(b)(4)(C). There have been no allegations that DeLuca violated Rule 9011 and thus the court only assesses whether he violated Section 707(b)(4)(C), albeit relying in part on Rule 9011 case law.

sumed that, since the debt is owed to a hospital, it must be for medical expenses and is thus dischargeable. While that may be true for most, if not nearly all, hospital debts, the Debtors did not retain DeLuca to help with the prototypical situation but rather their own unique situation.

DeLuca did not take any affirmative steps to make sure that the Debtors provided complete and accurate information. *See In re Robinson*, 198 B.R. at 1024. The Retainer Agreement requests copies of prior lawsuits, but there was no related follow-up. The Debtors complied by handing over various district court documents, but neither DeLuca nor any staff member probed any further. DeLuca took a passive role instead of getting personally involved in the Debtors' case. *See id.* While the Debtors, Seare in particular, are hardly models of credibility, there is no evidence that they intended to deceive DeLuca. To get rid of the garnishment, they surely knew that they should answer whatever related questions DeLuca asked.

DeLuca argues that he performed due diligence in light of the limited information that the Debtors provided and their urgency to file. There is clear consensus, however, that an attorney cannot solely rely on the information provided by a client if such information is reasonably apparent to be incomplete or inconsistent, or raises a "red flag." *See id.; In re Kayne*, 453 B.R. at 385; *Fleming Sales*, 611 F.Supp. at 519; *In re Triepke*, 2012 WL 1229524, at *5; *In re Moffett*, 2012 WL 693362, at *3; *In re Bradshaw*, 2011 WL 5854668, at *5 n. 3; *In re Alessandro*, 2010 WL 3522255, at *3; *In re Dean*, 401 B.R. at 924; *In re Withrow* (Bankr.Ct.), 391 B.R. at 228; 2 MOORE'S FEDERAL PRACTICE § 11.11[2]; *ABA Attorney Liability* 704.

Here, the documents provided by the Debtors were incomplete—really, how could they not be unless the Debtors hand-ed over the entire district court docket? The fact that the Judgment led to a garnishment was a sufficient red flag to require further inquiry. Blaming the Debtors for not providing sufficient information does not serve DeLuca's cause. Once again, the Debtors are not bankruptcy experts and could not know what information was relevant or necessary. That is why they retained DeLuca and why the Code places affirmative duties on consumer bankruptcy attorneys.

Other bankruptcy courts have rejected similar blame-the-client arguments. *In re Withrow* (BAP) rejected an attorney's claim that the client's "personal health issues and/or ... faulty memory" justified erroneous and inconsistent petitions and schedules. 405 B.R. at 513. Whatever errors may have been directly attributable to faulty information from the client, they were not sufficient to overcome the attorney's "sloppy and careless actions (or inactions). . . ." *Id.* The attorney failed to reasonably investigate the underlying facts, and the court sanctioned him under Section 707(b)(4)(C) and Rule 9011 in the amount of three times the fee that the lawyer intended to charge to the client. *Id.* at 514.

Similarly, *In re Moffett* rejected a lawyer's justification for failing to list a substantial asset in the petitions:

What [the attorney] misses, however, is that the Debtor provided exactly what she was told she had to provide to get her case filed. The fault for the lack of complete information rests with [the attorney] for not insisting that clients he represents be told—and required—to bring in all necessary information before a case will be filed. He cannot absolve himself of the duty to conduct a reasonable investigation [under § 707(b)(4)(C) ] by affirmatively allowing clients to bring in only the bare minimum of information

and then claiming that it is not his fault that he did not have sufficient information to review. 2012 WL 693362, at *3. Seare and Tedoco likewise provided the information that DeLuca requested. They answered the questions he asked. Whether the Debtors failed to ask the "right" questions to prompt further investigation is immaterial; DeLuca's duty to investigate was not contingent on the Debtors seeking more information about the bankruptcy process. *Id.* at *4.

 Nor did the Debtors' urgency to file absolve DeLuca of taking reasonable, and quite easy, steps to ascertain the nature of the Judgment. In one case, an attorney filed a Chapter 7 petition almost immediately after the clients stepped into his office. *In re Alessandro*, 2010 WL 3522255, at *1. The clients sought protection from imminent foreclosure. *Id.* The attorney asked if the debtor had ever filed for Chapter 7 protection before, to which the client answered "no," but the attorney failed to inquire about prior filings under other chapters and failed to independently review the court's docket for prior filings. *Id.* Shortly after filing, the bankruptcy court flagged the client as a repeat filer; she had two previous Chapter 11 and two previous Chapter 13 filings. *Id.* The court sanctioned the attorney under Section 707(b)(4)(C) and Rule 9011. *Id.* at *3–4. Although pressed for time, the attorney "could have easily checked the Court's PACER records." *Id.* at *3.

The Debtors' concern over the garnishment was real and deserved prompt attention, but they did not need a same-day filing. And even if they were in such need, reasonable steps should have been taken. DeLuca could have easily checked the district court docket on the PACER system. More broadly, part of an attorney's role is to guide clients through a complex, and possibly frightening, process. Consumer bankruptcy attorneys regularly deal with clients in financial straits that desire, or demand, immediate action. *See In re Moffett*, 2012 WL 693362, at *1 (client demanded filing on "emergency basis to stop a wage garnishment"). Attorneys must be able to respond in a measured way without being puppets to their clients' distress. The reasonableness of the required inquiry may depend in part on a client's urgency, but here the steps that DeLuca could have taken were so easy that no amount of urgency excused his failure to investigate the Judgment.

In short, DeLuca did not do his level best—or anything close to it—to get it right. *In re Withrow* (Bankr.Ct.), 391 B.R. at 228. He took no steps to independently investigate or verify the circumstances underlying the wage garnishment—falling well short of the "reasonable investigation" required by Section 707(b)(4)(C).

### b. Sections 526–528

### (1) Legal Standard

BAPCPA added provisions to the Code to govern the relationship between "debt relief agencies" and "assisted persons." 11 U.S.C. §§ 526–528 (2012). A "debt relief agency" is "any person who provides any bankruptcy assistance to an assisted person" in return for payment, such as consumer bankruptcy attorneys. *Id.* § 101(12A); *Milavetz, Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 130 S.Ct. 1324, 1331, 176 L.Ed.2d 79 (2010). An "assisted person" is "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $175,750." 11 U.S.C. § 101(3) (2012). A "consumer debt" is a debt incurred "by an individual primarily for a personal, family, or household purpose." *Id.* § 101(8).

Section 526 restricts debt relief agencies:

> A debt relief agency shall not (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title; ... (3) misrepresent to any assisted person ..., directly or indirectly, affirmatively or by material omission, with respect to ... the services that such agency will provide to such person; or the benefits and risks that may result if such person becomes a debtor under this title....

*Id.* § 526(a).

Section 527 mandates that debt relief agencies provide disclosures to assisted persons that, among other things, (1) briefly describe the general purpose, benefits, and costs of proceeding under Chapters 7, 11, 12, and 13 of the Code, and the types of services available from credit counseling agencies; (2) inform them that they must make truthful and accurate disclosures of income and assets; and (3) generally explain that litigation may be an outcome of filing for bankruptcy. *Id.* § 527.

Section 528 requires that a contract between a debt relief agency and assisted person be in writing and "clearly and conspicuously" explain the scope of services that the agency will provide and the fees or charges for such services. *Id.* § 528(a)(1). With the exception of the writing requirement, this section mirrors Nevada Rule 1.4. The debt relief agency must provide the assisted person with "a copy of the fully executed and completed contract." *Id.* § 528(a)(2).

The contract requirements must be fulfilled within five days of the first date on which the agency provided bankruptcy assistance services to the assisted person, and before the filing of the assisted person's petition. *Id.* § 528(a)(1).[30]

Violations of these sections are harsh for debt relief agencies. "[A]ny contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with [Sections 526–528] ... shall be void" and may only be enforced by the assisted person. *Id.* § 526(b).

#### (2) Application

██ As a consumer bankruptcy attorney, DeLuca qualifies as a "debt relief agency." 11 U.S.C. § 101(12A); *Milavetz,* 130 S.Ct. at 1331. He certainly gave "bankruptcy assistance" to the Debtors by providing legal counsel and preparing and filing their petition. 11 U.S.C. § 101(4A). The Debtors qualify as "assisted persons" because, first, their debts consist primarily of consumer debts—approximately two-thirds of their debts are consumer debts.[31] *In re Kelly,* 841 F.2d 908, 913 (9th Cir. 1988) ("'primarily' means 'for the most part' ... i.e., more than half....."), *cited in In re Canales,* 377 B.R. 658, 661 (Bankr.C.D.Cal.2007). Second, the Debtors filed a no-asset case; their non-exempt assets are nowhere near the $175,750 statutory threshold. 11 U.S.C. § 101(3) (2012). Consequently, DeLuca was required to comply with Sections 526–528 in his dealings with the Debtors.

---

**30.** Section 528 also includes advertising restrictions not at issue here. 11 U.S.C. §§ 528(a)(3), (4), 528(b).

**31.** The Debtors' debts total approximately $230,000, none of which are secured by real property. (Bankr.Dkt. No. 1, Summary of Schedules.) The consumer debts are approximately $159,500 (excluding the St. Rose Debt)—69 percent of the total debt. (*Id.*) Whether the St. Rose Debt is a consumer debt is immaterial, and the court does not reach that issue.

■ DeLuca's failure to accurately explain that he would not represent the Debtors in adversary proceedings and the risks that the Debtors could face in bankruptcy amounted to a violation of Section 526(a). As explained above, the Retainer Agreement states that representation for nondischargeability allegations and adversary proceedings would result in additional fees. DeLuca, however, flatly refused to provide these services once the Complaint was filed. Thus, he violated Section 526(a)(1) by failing to perform a service he informed the Debtors that he would provide in connection with their bankruptcy case. *Id.* § 526(a)(1).

■ DeLuca argues that the Debtors could not afford the additional services anyway, so it is immaterial whether he was willing to perform them or not. His argument, however, improperly benefits from hindsight—the Debtors' admission that they could not afford the other attorneys that they consulted. At the time DeLuca refused to perform the additional services, there is no evidence that he offered them to the Debtors and they refused for lack of funds. DeLuca offered no evidence to indicate that he consulted at all with the Debtors before sending them the letter of nonrepresentation in June 2012. As discussed above, DeLuca was required to represent Seare in the adversary proceeding because it was reasonably necessary to achieve the Debtors' ultimate goal—permanent cessation of the wage garnishment. Even if the adversary representation were not so necessary, however, the terms of the Retainer Agreement obligated DeLuca to quote a price to Seare for the adversary representation. The terms of a contract are not just what is written, but what is reasonably necessary to carry out the contract's purposes. *See Hotel Employees, Restaurant Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1467 (9th Cir.1992) ("[T]he courts can and should imply incidental terms necessary to effectuate the contract's purposes."). Because adversary representation was a purpose of the Retainer Agreement, the court views quoting a price for such representation as an implied term of the contract. DeLuca breached by failing to perform that term by quoting a price once the Complaint was filed.

■ DeLuca also violated Section 526(a)(3). He misrepresented the risks associated with an adversary proceeding that the Debtors were nearly certain to face if they filed for bankruptcy. *See* 11 U.S.C. § 526(a)(3) (2012). The Debtors argue that DeLuca told them the St. Rose Debt was dischargeable. The court does not find that he was so direct, but the statute nonetheless imposes liability for material omissions. Because stopping the garnishment was their primary goal, failing to address the risks of a related adversary proceeding was a material omission.

■ For essentially the same reasons set forth above in relation to Nevada Rule 1. 5, DeLuca violated Section 528(a). He partially complied by providing a written contract on the same day as the initial consultation. 11 U.S.C. § 528(a)(1). He failed, however, to provide a "fully executed and completed contract" because he did not sign the Retainer Agreement. *Id.* § 528(a)(2). The Retainer Agreement did not "clearly and conspicuously" explain the scope of services and fees. *Id.* § (a)(1). The Retainer Agreement is reasonably clear in that the attorney billing rate of $495.00 per hour is not buried or hidden, and that the list of services that require additional fees is explicit. There are two problems, however.

First, the list of excluded services uses technical terms. A layperson is unlikely to know what a nondischargeability allegation or bankruptcy adversary proceeding is.

Second, the standard form contract does not relate these services to a client's particular case. And here, in the absence of clarification from DeLuca or his staff, the Retainer Agreement is all that the Debtors had to go on. Since the Debtors did not know which additional services were likely to be needed, they had no way of knowing which exclusions were likely to apply and what the chances were of facing increased legal fees. *See In re Robinson,* 368 B.R. 492, 500–01 (Bankr.E.D.Va.2007). Where adversary litigation arises, those additional fees could greatly exceed the $2,000 flat fee. *See id.* at 501. *Robinson* found that a written contract violated Section 528(a)(1) because it consisted of a visually-dense, small-type single paragraph. Although DeLuca's agreement is not so impenetrable, *Robinson's* words are apt—"it is doubtful that a consumer debtor who has never been through the bankruptcy process and is not a sophisticated purchaser of legal services would have any real understanding, even after reading the contract, just how much is actually covered by the retainer." *Id.* at 500.

Whether DeLuca complied with the disclosure requirements of Section 527 is unknown. There is insufficient evidence for the court to determine what disclosures, if any, DeLuca provided aside from the Retainer Agreement and the FAQ. If, however, there were no other disclosures, then DeLuca did not comply with Section 527. The Retainer Agreement and FAQ do not include the required statement under Section 527(b), which, among other things, explains that litigation is a possible outcome of filing for bankruptcy. Nor do they include the Section 342(b)(1) disclosure, required by Section 527(a)(1), that explains the general characteristics of the different bankruptcy chapters. 11 U.S.C. § 527(a)(1) (2012).

Nonetheless, the court need not reach the potential Section 527 violations because DeLuca's non-compliance with Sections 526 and 528 render the Retainer Agreement void and enforceable only by the Debtors. *Id.* § 526(b).

## V. SANCTIONS

### A. The Purpose of Sanctions

A lawyer's primary obligations are to her client, but she also owes duties to the public, the legal system, and her profession. The ABA has recognized this in articulating that "the purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession." AM. BAR. ASS'N, JOINT COMM. ON PROF'L SANCTIONS, STANDARDS FOR IMPOSING LAWYER SANCTIONS 13 (2005) (the "ABA STANDARDS"). The *ABA Standards* were developed to address ethical violations—noncompliance with the ABA Model Rules and their state corollaries. In determining sanctions for such violations, deterrence is the essential goal—protection from actual and potential rulebreakers.

Likewise, the court may remedy violations of Section 707(b)(4)(C) by ordering sanctions with the predominant purpose of deterrence. *In re OBrien,* 443 B.R. 117, 144 (Bankr.W.D.Mich.2011); *In re Robertson,* 370 B.R. 804, 809 n. 8 (Bankr.D.Minn. 2007); *see In re Kayne,* 453 B.R. 372, 382; *In re Withrow* (BAP), 405 B.R. at 515.

The remedy for noncompliance with Sections 526–528 is not a sanction, but rather contract voidance and possible fee disgorgement. 11 U.S.C. § 526(c) (2012). The purpose of deterrence is the same, however, as these Code sections serve to promote proper conduct by consumer bankruptcy attorneys. *Cf. Milavetz,* 130 S.Ct.

at 1331 (Sections 526–528 apply to consumer bankruptcy attorneys). In determining whether to disgorge fees—either fully or partially—the court should focus on protecting debtors by deterring similar attorney conduct through compliance with Sections 526–528. *See Berry v. U.S. Trustee (In re Sustaita)*, 438 B.R. 198, 213 (9th Cir. BAP 2010) ("[T]he disgorgement of fees ... under § 526 ... does not constitute 'damages,' nor is disgorgement in any way punitive."); *cf. In re Irons*, 379 B.R. 680, 687 (Bankr.S.D.Tex.2007) ("When the Court witnesses possible abuse of debtors by their own lawyers, the Court is compelled to act.").

### B. The Range of Sanctions

 "Bankruptcy courts have the inherent authority to regulate the practice of attorneys who appear before them." *In re Nguyen*, 447 B.R. 268, 280 (9th Cir. BAP 2011) (en banc) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). "Bankruptcy courts ... have express authority under the Code and the Rules to sanction attorneys, including disbarment or suspension from practice" *Id.* at 281 (citing *Price v. Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1058, 1062 (9th Cir.2009)); 11 U.S.C. § 105(a) (2012) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."). "The bankruptcy court has wide discretion in determining the amount of a sanctions award." *In re Kayne*, 453 B.R. at 386 (internal quotation marks and citation omitted); *see In re Withrow* (BAP), 405 B.R. at 514.

The BAP has endorsed the use of the *ABA Standards* to determine the appropriate sanctions for attorney misconduct. *See In re Nguyen*, 447 B.R. at 277 (holding that although failure to follow the *ABA*

*Standards* is not an abuse of discretion, they remain a "helpful guide in the imposition of sanctions").

The *ABA Standards* includes a non-exhaustive list of potential sanctions, which the court may impose individually or collectively: (1) disbarment; (2) suspension; (3) interim suspension; (4) reprimand, a declaration that the lawyer's conduct was improper without limiting the lawyer's right to practice; (5) admonition, a non-public reprimand; (6) probation, which allows the lawyer to practice under specified conditions; (7) reciprocal discipline; and (8) various other sanctions and remedies, such as restitution, assessment of costs, limitation upon practice, appointment of a receiver, requiring that the lawyer take the bar examination or professional responsibility examination, or requiring that the lawyer attend continuing education courses. ABA STANDARDS 14–16.

The Local Rules for the District of Nevada also grant considerable leeway in fashioning sanctions for violations of the Nevada Rules of Professional Conduct. Local Rule 1A 10–7 ("[A]ny attorney who violates these standards of conduct may be disbarred, suspended from practice before this Court for a definitive time, reprimanded or subjected to such other discipline as the Court deems proper.").

Violations of Sections 526–528 render the contract void and enforceable only by the debtor. 11 U.S.C. § 526(c)(1) (2012). If the attorney's violation was intentional or negligent, she is liable to her client for any fees or charges received, actual damages, and reasonable attorney's fees and costs. *Id.* § 526(c)(2); *see In re Gutierrez*, 356 B.R. 496, 506 (Bankr.N.D.Cal.2006).

Section 329(b) and Rule 2017 provide independent bases for the court to examine the reasonableness of attorney's fees. 11 U.S.C. § 329(b) (2012); FED. R. BANKR.P. 2017. If the court determines

that the "compensation exceeds the reasonable value" of the attorney's services, it may cancel the retainer agreement or order disgorgement. 11 U.S.C. § 329(b) (2012).

Courts have awarded a variety of sanctions for the violations that DeLuca has committed. For unbundling in violation of ABA Model Rule 1.2(c) (or its predecessor or state corollary), courts have awarded or endorsed fee reductions under Section 329(b). *In re Johnson,* 291 B.R. at 472; *In re Castorena,* 270 B.R. at 532 n. 49; *see In re Slabbinck,* 482 B.R. at 580. *But see In re Egwim,* 291 B.R. at 581 (sanctions not awarded because lawyer had good faith belief that the unbundling was appropriate and the debtors suffered no adverse consequences).

For violations of Section 707(b)(4), one bankruptcy court suspended the attorney's filing privileges for one year and ordered four hours of continuing education courses—three hours in consumer bankruptcy and one in ethics. *In re Moffett,* 2012 WL 693362, at *4. There, the attorney filed the petition at the client's urging on "an emergency basis to stop a wage garnishment" and failed to list a structured settlement payment. *Id.* at *1. The attorney relied solely on the information provided by the client and failed to perform any independent investigation, and blamed his inadequately trained staff for the incomplete petition. *Id.* at *3–4. The court had previously admonished the attorney for similar conduct. *Id.* at *4.

Another bankruptcy court ordered disgorgement under Section 329(b) and Rule 2017 for failing to research the PACER records for previous filings by his client and failing to inform the court of his client's status as a repeat filer once he should have learned of it. *In re Alessandro,* 2010 WL 3522255, at *4–5. The court stated that, in a situation where pre-filing investigation is impractical or time is of the essence to protect the client's rights, the duty of reasonable inquiry requires the attorney to move for withdrawal if the attorney learns that she has been misled by a debtor. *Id.* at *4. The court placed a notice of the prior filings on the electronic docket three days after the petition was filed. *Id.* The attorney either was not aware of this notice or chose to remain silent. *Id.*

In another case, the First Circuit BAP affirmed a bankruptcy court's order of sanctions in the amount of three times the lawyer's fee where the lawyer blamed the client for inconsistent and inaccurate information on the schedules and petitions. *In re Withrow* (BAP), 405 B.R. at 514. Likewise, the Ninth Circuit BAP affirmed a $20,000 sanction for the trustee's costs and fees in bringing a motion under Section 707(b)(4) and Rule 9011 for what the court found to be an "egregious" failure to list a promissory note payable to the debtor on the petition. *In re Kayne,* 453 B.R. at 385. *In re Triepke* imposed a unique sanction for errors and omissions in the petition violative of Section 707(b)(4) and Rule 9011. *In re Triepke,* 2012 WL 1229524, at *10. The court ordered disgorgement under Section 329(b) and Rule 2017, and that the attorney review the ABA Working Paper on Best Practices for Debtors' Attorneys, the applicable local rule concerning electronic filing, and certify to the court that he had performed such review. *Id.*

For violations of Sections 526–528, bankruptcy courts have ordered partial and total fee disgorgement. *In re Gutierrez,* 356 B.R. at 506; *In re Robinson,* 368 B.R. at 502.

DeLuca argues that the court cannot compel him to represent Seare in the adversary proceeding because to do so would amount to involuntary servitude in violation of the Thirteenth Amendment to the

United States Constitution. (Bankr.Dkt. No. 27 at 8.) He claims that the "basic services bargained for between the parties did not include litigation or adversary proceedings." (*Id.*) He is correct that the "basic services" covered by the flat fee do not include adversary representation, but the "additional services" do include such representation. (Ex. G at 7.) The parties did in fact bargain for adversary representation, albeit for an extra fee. The parties have settled the adversary proceeding, so the court will not consider ordering DeLuca to specifically perform under the Retainer Agreement.[32]

## C. The *ABA Standards*

Before applying the *ABA Standards* to DeLuca's violations, it is worth recapping what those violations are. DeLuca violated the duty of competence, Nevada Rule 1.1, by unbundling services (adversary representation) that were reasonably necessary to achieve the Debtors' reasonably anticipated result—permanent cessation of wage garnishment. He violated Nevada Rule 1.2(c) because unbundling adversary representation was unreasonable under the circumstances and because he failed to obtain the Debtors' informed consent. Next, he violated Nevada Rule 1.5 by failing to properly explain the scope of ser-

vices and fees when the Debtors agreed to retain him. Lastly, he violated Nevada Rule 1.4 by failing to properly communicate with clients—about the overall progress of their case and St. Rose's intent to file an adversary proceeding.

Concerning the Bankruptcy Code, DeLuca violated Section 707(b)(4)(C) by failing to reasonably investigate the nature of the Judgment. He violated Section 526(a)(1) when he failed to quote a price to the Debtors for adversary representation and instead flatly refused to represent them. He violated Section 526(a)(3) by failing to explain the risks of filing—namely, that an adversary proceeding was a near certainty. Next, he violated Section 528(a)(2) by failing to provide a "fully executed" contract to the Debtors. Finally, he violated Section 528(a)(1) by failing to "clearly and conspicuously" explain the scope of services and fees when the Debtors retained him.

The *ABA Standards* dictates consideration of four criteria: (1) the duties violated, whether owed to a client, the public, the legal system, or the profession; (2) the lawyer's mental state, whether she acted intentionally, knowingly, or negligently; (3) the seriousness of the actual or potential injury caused by the lawyer's

---

**32.** In any event, courts are loath to order specific performance in personal services contracts due to the concern over timely and effective performance by a nonwilling party. *See* RESTATEMENT (SECOND) OF CONTRACTS § 367 (1981). Nonetheless, DeLuca is wrong about the law. If a contract clause is stricken as void as against public policy or otherwise unenforceable, the court may sever that clause and order performance of the remainder of the contract. *Dawson v. Goldammer*, 295 Wis.2d 728, 722 N.W.2d 106, 111–12 (App.2006); RESTATEMENT (SECOND) OF CONTRACTS §§ 178, 184 (1981); *cf. Janik v. Rudy, Exelrod & Zieff*, 14 Cal.Rptr.3d 751, 758, 119 Cal.App.4th 930, 940 (2004) (an attorney's obligations may extend beyond the four cor-

ners of a limited scope agreement so as to include the duty to assert claims arising out of the same facts that the client would reasonably expect to be asserted to accomplish the objectives of the representation); Del. State Bar Ass'n, Comm. Prof'l Ethics, Opinion 2006-1 (Jan. 26, 2006) ("[T]he attorney may be required to perform beyond the terms of the [limited scope] retention agreement if the Court requested, or the Client's circumstances warranted such action.") (discussing DEL. RULE OF PROF'L CONDUCT 1.2(c), which is identical to NEV. RULE OF PROF'L CONDUCT 1.2(c)). That would not amount to involuntary servitude but rather to holding a contracting party to its obligations.

misconduct; and (4) the existence of aggravating or mitigating circumstances. ABA Standards 9; *In re Nguyen,* 447 B.R. at 277.

### 1. The Duties Violated

The most important duties are those owed to the client—loyalty, diligence, competence, and candor. ABA Standards 9–10. In descending order of importance are the duties owed to the general public, the legal system, and the legal profession. *Id.* at 10. The public is entitled to be able to trust lawyers to protect their property, liberty, and lives. *Id.* Accordingly, lawyers should behave with honesty and integrity. *Id.* Being able to trust lawyers to protect one's property is especially important for consumer bankruptcy debtors, who typically seek representation in dire circumstances and face a complex legal process. The system is harmed where lawyers create or use false evidence or intend to deceive the court, and where the lawyer's behavior puts an unreasonable burden on the court. *Id.* The profession is harmed where an attorney's practices reflect poorly on the profession or contribute to a decline in the overall quality of services provided by attorneys in a practice area or region. *See id.*

DeLuca violated his duties to the Debtors, the public, the legal system, and the legal profession. The court considers his violations of the duties of competence and diligence to be of the utmost concern. He failed to perform the most essential of functions—ascertaining the client's objectives. This failure was the first domino. He could not competently unbundle adversary representation without knowing how crucial such representation could be in the Debtors' situation. Nor could he obtain informed consent. He did not diligently represent the Debtors; he failed to keep them properly informed. Whether framed under the duty of competence or diligence, he failed his duty to provide the debtors with transparent information about the scope of services and his fee structure under the Retainer Agreement. The Debtors were not in a position to understand the benefits and risks of filing for bankruptcy, the likely costs to them, in terms of time and money, and the other options available. He failed the core attorney duty of treating each client as an individual. He unbundled based on his needs, not those of the Debtors. *See* ABA Handbook 7.

DeLuca violated his duty to the public by practicing in a manner that erodes the public's trust in attorneys. He treats all clients the same, creating the impression that attorneys are more interested in fees than solving individual client's problems. He does not explain that his fee structure, which unbundles various services, may not be standard practice or that it creates certain risks. *See* Restatement (Third) of Law Governing Lawyers § 19 (2000). This fosters the same impression of profits over clients. The public may grow more distrustful of lawyers if they feel channeled into limited forms of representation that do not respond to individual needs. Because laypeople are unlikely to understand the advantages and risks of unbundled legal services, the general public is harmed to the extent that DeLuca's practice is becoming the norm for consumer bankruptcy attorneys. *See id.*

DeLuca's conduct also harmed the legal system. While his behavior did not rise to deceit, his abandonment left the court system to deal with a pro se litigant in a complicated adversary proceeding. The court faces considerable administrative challenges with pro se litigants, and if the court takes any action to assist the pro se litigant, however innocent, the court may face allegations of impartiality. *See In re*

*Cuddy*, 322 B.R. at 17. DeLuca's Rule 2016(b) disclosure states that adversary proceedings are excluded from the $2,000 flat fee, rather than that adversary proceedings are excluded from DeLuca's scope of services entirely. The court does not find that DeLuca violated his obligations under Rule 2016(b). The court merely points out that it had no way to know that DeLuca would not represent Seare in the adversary proceeding.

### 2. DeLuca's Mental State

The *ABA Standards* defines three mental states—intent, knowledge, and negligence—in descending order of culpability. ABA STANDARDS 10. "Intent" is when the lawyer acts "with conscious objective or purpose to accomplish a particular result." *Id.* "Knowledge" is when the lawyer acts "with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. *Id.* "Negligence" is when a lawyer "fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

DeLuca's failure to investigate the Debtors' circumstances—the wage garnishment and the Judgment—was negligent. The reasonable lawyer in that initial consultation would have performed an independent investigation. DeLuca failed to be aware of the substantial risk of an adversary proceeding that the Debtors were nearly certain to face, and consequently could not advise them about the risks associated with such a proceeding. Not all of his conduct, however, was merely negligent.

He knowingly created a system that fails to explain the risks of particular cases to clients. His system intends to do generally, by use of standard form contracts, that which can only be done specifically. He knowingly chose to unbundle certain legal services for all clients, regardless of their circumstance. The Retainer Agreement and the FAQ are the only information provided to clients, and they do not explain the risks of unbundled services, either general or specific to one's case. These documents are insufficient to form the basis of informed consent. He repeatedly failed to call the Debtors back when they specifically requested that he, not his staff, return the calls. The repeated nature of this failing contributes to the conclusion that he treats all clients the same and does not provide individualized service.

He knowingly took steps during the course of representation to make sure that he would not represent Seare in the adversary proceeding. He knowingly structured the Retainer Agreement to require extra fees for adversary representation, yet he did not quote a price to Seare for representation in this adversary proceeding. Instead, he sent Seare the nonrepresentation letter. He also knowingly failed to forward the proposed stipulation and order that St. Rose sent to him one month prior to filing the Complaint. Further, he knowingly failed to sign the Retainer Agreement.

### 3. Seriousness of the Injury

"The extent of the injury is defined by the type of duty violated and the extent of actual or potential harm." ABA STANDARDS 11.

The court first examines the actual injuries to the Debtors. The Debtors spent considerable time pursuing the bankruptcy case and $2,000 in legal fees. If they had known that the St. Rose Debt was nearly certain to face a nondischargeability allegation, they may not even have filed in the first place. Their other creditors were not dunning them. Although Seare is the defendant in the adversary proceeding, both

he and Tedoco spent time and energy seeking alternative counsel for him. They also lost time communicating with DeLuca about the nonrepresentation. They further spent time and energy attending the OSC Hearing, the Evidentiary Hearing, and preparing the related briefs. The Debtors have also had to endure the stress of not being represented by counsel in the central dispute of their bankruptcy. They have expressed frustration and feelings of deception based on DeLuca's advertisements of full-service lawyering. They did not expect to be in the midst of a bankruptcy and all of a sudden have to find another lawyer.

The potential injuries to the Debtors, and to Seare in particular, are also significant. If Seare and St. Rose had not settled, they would still be embroiled in litigation and preparing for trial. Seare would either be facing a complex proceeding pro se or paying alternative counsel. The cost of that counsel would likely be greater than what DeLuca would have charged because another lawyer would have had to become familiar with the case. The emotional toll for Seare and Tedoco would also likely be great if the proceedings were ongoing.

DeLuca argues that the Debtors were not prejudiced by his nonrepresentation, and that, in fact, they benefitted from the bankruptcy. (Bankr.Dkt. No. 27 at 10, 13.) He first contends that Seare suffered no prejudice because DeLuca advised him "immediately after the filing of the adversary proceeding" of the nonrepresentation. (O SC Hr'g Tr. 10.) DeLuca did not, however, inform Seare *immediately* after the § 341 meeting in March 2012, or *immediately* after the receipt of the proposed order and stipulation (about one month before the Complaint was filed), of the nonrepresentation. DeLuca did not even give Seare the bad news until Seare asked whether the St. Rose Debt had been discharged in an e-mail on June 4, 2012, about two weeks after the Complaint was filed. Had Seare known of the nonrepresentation in a timely manner, he may have been in a position to better mitigate the harm. If Seare had not inquired about the St. Rose Debt, it is unclear when, if ever, DeLuca would have informed him of the nonrepresentation.

DeLuca next contends that Seare had ample time to procure alternate representation. This argument misses the point and is belied by the facts. DeLuca did not send the letter of nonrepresentation until about two weeks after the Complaint was filed, putting Seare in the untenable position of having to scramble to prepare a pro se answer, which he did, or try to retain counsel that could prepare a competent answer within a short time frame. In addition, time is not the only relevant issue. Even if Seare had sufficient time, obtaining alternate counsel was unaffordable—presumably because of the costs of learning the particulars of the case.

Regarding cost, DeLuca claims that Seare did not suffer any prejudice because he could not afford DeLuca's additional fees anyway. This argument fails for several reasons. First, DeLuca never quoted a fee for additional services so he could not have known whether Seare could afford any additional fees. Second, this argument unfairly benefits from hindsight. Seare testified that he could not afford additional fees, but DeLuca did not know this at the time he decided not to represent him. Third, DeLuca was obligated to provide the services regardless of whether Seare could afford them. Adversary representation was reasonably necessary to achieve the Debtors' goals. Even if not reasonably necessary, however, withdrawal for nonpayment of fees in the midst of litigation requires leave of court and De-

Luca did not move for withdrawal. *See* NEV. RULE OF PROF'L CONDUCT 1.16 (2011); *In re DeSantis*, 395 B.R. at 170 ("Attorneys who agree to represent a debtor must provide the agreed services unless and until the Court allows withdrawal.").

Also concerning costs, DeLuca argues that Seare benefitted from the bankruptcy because nearly $137,000 in unsecured debt was discharged for his $2,000 fee. This argument entirely misses the purpose of legal representation, however. The Debtors did not "purchase" a discharge from DeLuca. They retained him for professional services. The value of the services does not depend solely on the amount of the discharge; in some cases, the discharge itself might be a lesser goal. They paid him for his experience and expertise, neither of which were sufficiently applied to the facts of their case. Seare admitted that the discharge was a benefit, just not the benefit they retained DeLuca to provide, and based on what occurred at the initial consultation, their expectation of discharging the St. Rose Debt was reasonable.

DeLuca further argues that the Debtors' goals were partially realized because the garnishments stopped for the pendency of the bankruptcy. DeLuca was not retained for this temporary benefit though. Any pro se filer can obtain this benefit, since the automatic stay is, well, automatic, once the petition is filed. DeLuca essentially served as a bankruptcy petition preparer in obtaining this benefit for the Debtors.

Finally, DeLuca argues that Seare benefitted because his credit score is projected to improve by 102 points. (Bankr.Dkt. No. 27 at 31; Ex. P.) Although Seare admitted the increase would be a benefit, this pro-

jection may be meaningless. DeLuca testified that he did not know how CIN calculates the scores; his understanding is that they only consider total debt and not the nature of the debt (e.g., nondischargeable and/or incurred through fraud). (Evid. Hr'g Tr. 42:19–44:5.)

The court finds DeLuca's arguments unavailing. The Debtors, and Seare in particular, suffered substantial actual and potential injury from DeLuca's unethical behavior.

The injury to the public, the legal system, and the profession, must also be considered. DeLuca's conduct has eroded the public trust by serving as an example of one more lawyer that values efficiency and what is best for him over the client's needs. Regrettably, the court has had to expend considerable time and resources to pursue this sanctions matter.[33] The profession suffers, albeit intangibly, where the overall level of consumer bankruptcy practice is dragged down by unethical behavior. These harms are impossible to quantify, but they are nonetheless real.

### 4. Aggravating or Mitigating Factors

The court may consider aggravating and mitigating circumstances in deciding what sanction to impose. ABA STANDARDS 25. Aggravating factors justify an increase in the degree of discipline imposed. *Id.*; *In re Nguyen*, 447 B.R. at 277. They include (1) dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge wrongful nature of conduct; and (5) substantial experience in the practice of law. ABA STANDARDS 26–27. To lesser or greater extent, all of these factors are present for DeLuca. He knowingly creat-

---

**33.** With the second-busiest bankruptcy docket in the country, the court would prefer to spend time on the substantive matters on docket. But regulating the attorneys that

practice before the court is a necessary component of what the court does to protect the public and the integrity of the profession.

ed a system that maximizes efficiency, and therefore profit, in exchange for less client interaction and less attention to clients' particular needs and goals. This can only be characterized as selfish, and a violation of the fiduciary duty to place clients' needs first. That he uses a standard form contract that fails to properly explain the risks of unbundling demonstrates a pattern of misconduct. Just in his dealings with the Debtors he committed multiple ethical offenses, although they really stem from the same set of mistakes. He has refused to admit his mistakes; he has repeatedly blamed the Debtors for failing to provide the correct information. Lastly, he is a highly experienced consumer bankruptcy practitioner. He is obligated to be aware of his duties under the ethical rules and under the Bankruptcy Code.

 Mitigating factors justify a decrease in the degree of discipline imposed. *Id.* at 25; *In re Nguyen,* 447 B.R. at 277. They include: (1) absence of a prior disciplinary record; and (2) timely good faith effort to make restitution or to rectify consequences of misconduct. ABA STANDARDS 27–28. To the court's knowledge, DeLuca has not been previously sanctioned by any federal or state court. He has made several efforts to rectify his errors, although whether they were in good faith is questionable. During the OSC Hearing, he offered to reimburse his $2,000 fee to the Debtors (OSC Hr'g Tr. 10:16–1.) The court appreciates this gesture, but even if the Debtors accepted, they would not be placed back where they were before they consulted with DeLuca. He also offered to represent Seare in the settlement negotiations with St. Rose. (Evid. Hr'g Tr. 45:15–46:7.) Although DeLuca perceived Seare to be a "danger" to his firm, he saw this as the most expedient way to extricate himself from the matter. (*Id.*) The court doubts that DeLuca made

these gestures in good faith because his motives seem to be more about avoiding sanctions than rectifying harm. Nevertheless, the court recognizes the gestures as mitigating factors.

## D. The Sanctions Imposed

 DeLuca violated the most important duties of a lawyer—those to his clients—as well as duties to the public, the legal system, and the legal profession. Many of his actions were done knowingly, while in some instances they were merely negligent. As a consequence of these violations, the Debtors suffered substantial actual and potential injury. The public, the legal system, and the legal profession were also victims. While he made several attempts to rectify the Debtors' injuries, the aggravating factors overwhelm the mitigating factors.

The *ABA Standards* recommends sanctions depending on the duty violated and the lawyer's mental state. They are a good starting point. For the types of violations that DeLuca has committed, the suggested sanctions follow a consistent theme—suspension for knowing violations and reprimand for negligent violations. ABA STANDARDS 18–19, 21, 24.

Based on the *ABA Standards* and the court's authority under Sections 105(a), 329(b) and 526(c), the court hereby imposes the following sanctions on DeLuca:

### 1. Disgorgement of Fees

The court orders the disgorgement of all attorney's fees that the Debtors paid to DeLuca, including but not limited to the $1,995.00 paid under the Retainer Agreement. Under Section 329(b), the court may order the return of fees that "exceed[ ] the reasonable value" of the services rendered by DeLuca. 11 U.S.C. § 329(b) (2012). Although DeLuca did not provide the Debtors with what they reasonably expected in the circumstances—

permanent cessation of garnishment—his services were not without any value. The Debtors received a discharge of all their dischargeable debts and garnishment was temporarily stayed. The lack of individualized attention rendered DeLuca a bankruptcy petition preparer at best. In this sense, the court finds that the reasonable value of DeLuca's services was $150.00.[34]

DeLuca is not entitled to retain this $150.00, however, because deterrence is best-served by disgorging all of the fees. The totality of the ethical and statutory violations, and the harms thereby caused to the Debtors, the legal system, the public, and the profession, are sufficiently severe such that the court cannot send the message that an attorney who so behaves will retain any compensation. DeLuca failed his essential, fundamental duty—determining the Debtors' primary objective—and cannot be rewarded.

Section 526(c) provides independent grounds for total disgorgement. DeLuca's noncompliance with Sections 526 and 528 render him liable to the Debtors "in the amount of any fees or charges in connection with providing bankruptcy assistance" to them. *Id.* § 526(c)(2). In other words, he is liable for the entirety of his attorney's fees. The court finds that total disgorgement is the most appropriate way to promote compliance with Sections 526–28.

The *ABA Standards* also supports disgorgement. Although these standards do not expressly link disgorgement to any specific mental state, disgorgement fits well in the general framework of reprimand for negligent violations and suspension for knowing violations. DeLuca engaged in both negligent and knowing conduct, but his core mistake

was due to negligence. A suspension is not warranted but a mere reprimand would be insufficient. Disgorgement is thus appropriate, and necessary to deter similar unethical conduct. The aggravating factors also warrant more than a reprimand, as DeLuca is an experienced practitioner, he engaged in a pattern of selfish conduct, and blamed the Debtors instead of owning up to his professional shortcomings.

Moreover, several bankruptcy courts have ordered total disgorgement in like circumstances. *In re Alessandro,* 2010 WL 3522255, at *4–5 (failure to research PACER system for prior filings violated § 707(b)(4)); *In re Gutierrez,* 356 B.R. at 506 (violations of §§ 527–28); *cf. In re DeSantis,* 395 B.R. at 169–70 (disgorgement of all or a substantial portion of fees would likely follow a withdrawal based upon attorney's belief that she cannot or should not represent a debtor in a reaffirmation decision).

The court has wide discretion to fashion appropriate sanctions; the *ABA Standards* lists restitution as an available remedy; the Code authorizes disgorgement in this circumstance; and case precedent provides additional support. The court believes that complete disgorgement is a fair remedy that sends the appropriate message to the consumer bankruptcy bar that operating consumer bankruptcy "mills" that fail to provide individualized representation inheres the risk of receiving zero compensation where such failure deprives the client from being able to obtain the relief for which she sought assistance of counsel in the first place.

---

34. U.S. Trustee Program, Region 17, Guidelines for Petition Preparers in the Dist. of Nev. (1997), *available at* http://www.justice.gov/ust/r17/docs/general/nv/petition_preparer_ guidelines.pdf (last visited Feb. 25, 2013) (maximum compensation for a bankruptcy petition preparer is $150.00).

Because DeLuca has not previously been sanctioned, and made some effort to mitigate the harm to the Debtors by offering to refund the fee and represent Seare in negotiations with St. Rose, the court does not order any monetary sanctions beyond fee disgorgement. There is precedential and statutory support to do so, but the court declines to go so far. 11 U.S.C. § 526(c)(2) (2012) (liability for actual damages); *see In re Withrow* (BAP), 405 B.R. at 513.

### 2. Publication of this Decision

The court orders that this opinion be submitted for publication in West's *Bankruptcy Reporter*. Publication is a form of reprimand, which the *ABA Standards* expressly endorses for negligent violations. The seriousness of the harms caused by DeLuca supports a public reprimand. "Only in cases of minor misconduct, when there is little or no injury to a client, the public, the legal system, or the profession, and when there is little likelihood of repetition by the lawyer, should private discipline be imposed." ABA STANDARDS 13. While DeLuca himself may not engage in the same conduct in the future, the purposes of sanctions are to deter such conduct by all attorneys.

Publication serves to deter future sanctionable conduct by shining light on DeLuca's behavior, and more broadly on the negative repercussions of operating a consumer bankruptcy "mill." The public is better protected by increased awareness of the pitfalls of unbundled representation in general and in the consumer bankruptcy arena in particular. The bar is better informed about what types of conduct are sanctionable and the nature of the sanctions that may be imposed; the level of practice in the community should thus improve.

### 3. Continuing Education

The court orders DeLuca to complete five hours of continuing education regarding collection and enforcement of judgments, and ten hours regarding ethical responsibilities to clients. He must complete the courses within one year of the date of entry of this opinion. DeLuca shall submit proof of attendance to the court within one week of completing each course.

The essential purpose of this sanction is to deter DeLuca from repeating the conduct that led to these sanctions in the first place. Next, this sanction signals to the bar that an understanding of judgment collection is necessary to the practice of bankruptcy law, as is the understanding of a lawyer's ethical duties. DeLuca's experience as a practitioner did not itself deter his misconduct. Therefore, the court must take more coercive action to ensure that Mr. DeLuca has the necessary knowledge to represent consumers within the bounds of ethics and the Bankruptcy Code.

### 4. Provision of this Decision to Future Clients

Finally, the court orders DeLuca to provide a copy of this opinion to every client in the next two years (commencing on May 1, 2013) who is sued in an adversary proceeding, but only if DeLuca declines to represent them in that adversary proceeding for any reason. If DeLuca properly declines to represent a client in an adversary proceeding—where such limitation is reasonable under the circumstances and the client gives informed consent—then this opinion will merely serve to confirm that DeLuca's limitation on services is proper. If not, then the opinion will serve to put clients on notice that DeLuca has unethically unbundled services in the past and that unbundling contains certain risks.

The court finds this sanction especially important because DeLuca engaged in a

pattern of selfish misconduct that likely extends beyond his representation of the Debtors. The court seeks to ensure that each future client that finds herself in the same situation as the Debtors is properly informed. Because DeLuca knowingly established a system that does not provide sufficiently individual representation, the two-year duration is intended to promote a systematic change in his practice—namely, an assessment of the reasonableness of unbundling services based on each client's circumstances and the proper communication of the risks of unbundling to each client. The broader goal is to promote better practices within the consumer bankruptcy bar in general.

This sanction also informs the bar that being caught for unethical conduct has repercussions beyond just paying a fine and moving on. Whether to behave ethically should not just be a business calculation that weighs the cost of being caught against the potentially higher profits of streamlining representation to the point at which each client is treated like the next. DeLuca's sanctionable conduct occurred in a case in which an adversary proceeding was filed—a rare occurrence. Given its rarity, DeLuca need not provide a copy of this opinion to every prospective client. But where he is placing a client in the same predicament as the Debtors, that client should be aware of the related risks. The court believes that the best way to assure such awareness is to mandate the provision of this opinion, which in turn should deter unethical conduct.

Noncompliance with any of the above may result in the imposition of additional sanctions or a finding of contempt of court.

## VI. CONCLUSION

DeLuca's business model automatically divorces representation in a consumer's main Chapter 7 case from representation in any adversary proceeding that arises after filing—a practice known generally as "unbundling." While unbundling is not necessarily evil, it must be done intelligently and in accordance with the applicable rules of professional responsibility. One of the aspects of a regulated profession such as law is that the ethical and other rules governing lawyers restrict a lawyer's freedom of contract with his or her clients. These rules require that limitations in representation such as unbundling have to be consistent with the goals of the legal representation, and that the client must give informed consent to the limitations. This should not be exceptional. These rules and the practices of most attorneys are consistent with unbundling of adversary proceedings in most bankruptcy cases.

Here, however, they failed. They failed because DeLuca failed to ascertain the Debtors' goals, and failed to properly inform himself of the circumstances surrounding Seare's wage garnishment. Underlying these failures was DeLuca's system which generically treats all clients the same, with little or no individualized differentiation. But the practice of law is not a one-size-fits-all consumer good; it is a profession that demands individual attention to each client. Lawyers have fiduciary duties to clients, and by definition a fiduciary duty means lawyers must place clients' interests above their own. DeLuca has done the opposite, by knowingly designing a system that prioritizes efficiency and uniformity above the particularized needs of each client.

DeLuca violated multiple state ethical rules and sections of the Bankruptcy Code as set forth above. Yet all these violations stem from a single source—his "mill" system of processing cases. By blindly adhering to his system in this case, DeLuca violated Nevada Rules 1.1, 1.2, 1.4, and

1.5, and Bankruptcy Code sections 526, 528, and 707(b)(4)(C). The court believes that the sanctions imposed should sufficiently incentivize DeLuca to practice consumer bankruptcy in a manner that pays appropriate attention to the details of each client's case, and should sufficiently deter other attorneys from unethically unbundling legal services.

Based on the foregoing, the court ORDERS Anthony J. DeLuca SANCTIONED as set forth above.

This opinion constitutes the court's findings of fact and conclusions of law under Rule 7052, made applicable here by Rule 9014(c).